Pennsylvania Human Relations Commission, Appellant, *v.* Chester School District.

Argued April 24, 1967. Before BELL, C. J., MUS-
MANNO, JONES, EAGEN, O'BRIEN and ROBERTS, JJ.

*Nathan Agran,* General Counsel, for appellant.

*Guy G. deFuria,* for appellee.

*Paul A. Feiner,* for amicus curiae.

OPINION BY MR. JUSTICE ROBERTS, September 26,
1967.:

The crux of this controversy concerns the authority
of the Pennsylvania Human Relations Commission over
charges of alleged de facto segregation in the school
system of the City of Chester.[1]  Akin to this central

---

[1] As the courts below observed, de facto segregation "remains
undefined in its full concept," yet at the same time it is a mean-
ingful term.  85 Dauph. 18, 25, 224 A. 2d 811, 820 (1966).  Accord-
ing to one student of the problem, "de facto segregation may be

problem is whether the Commission's findings of fact are supported by substantial evidence.

In November 1964, after a series of public hearings conducted in the City of Chester, the Commission ordered the Chester School District "by and through the Chester School Board, its officers, agents, and employes," to "take immediate steps to desegregate effectively" six public schools whose enrollments were either all Negro or substantially all Negro.[2]  On appeal the Court of Common Pleas of Dauphin County, sitting as the Commonwealth Court, held that unless the Chester School District intentionally fostered or maintained segregation in the public schools, the Commission exceeded its jurisdiction in ordering the School District to take affirmative steps to relieve racial imbalance in its schools.[3]  Moreover, the court further held those findings relied upon by the Commission to substantiate such responsibility were arbitrary and capricious.  The Superior Court, adopting the Dauphin County Court's opinion as its own, affirmed; Judge HOFFMAN filed a dissenting opinion in which Judge SPAULDING joined, 209 Pa. Superior Ct. 37, 224 A. 2d 811 (1966).  We granted allocatur.  For reasons stated

---

defined simply as the racial imbalance in schools which occurs when the number of Negroes in a compact Negro area becomes so great that drawing school zone boundaries on a geographical basis causes the great majority of Negro children to attend schools which are overwhelmingly Negro in population." Kaplan, Segregation Litigation and the Schools—Part I: The New Rochelle Experience, 58 Nw. L. Rev. 1, 2 (1963). See also, United States v. Jefferson County Bd. of Educ., 372 F. 2d 836, 878 n. 92 (5th Cir. 1966) for other definitions of the term.

[2] Douglass Junior High School and the following elementary schools: Dewey-Mann, Franklin, Lincoln, Washington, and Watts. The Chester School System consists of one senior high school, four junior high schools, and eleven elementary schools.

[3] The Dauphin county court's opinion is reported at 85 Dauph. 18, 224 A. 2d 811, 816 (1966).

hereinafter we reverse the decisions of the courts below.

## I.   The Factual Background

The academic year 1963-64 was one of unfortunate racial strife for the citizens of Chester. Negro residents of the city, assisted by civil rights advocates from neighboring communities, conducted a series of protest demonstrations aimed at inducing city officials to furnish their children quality, integrated education and to halt certain administrative practices which they alleged resulted in racial discrimination. The school board contended that the all Negro schools were the result of residential patterns for which they were not responsible, and denied the allegations of purposeful discrimination. Largely as a result of the obstinate refusal by both the school board and the civil rights groups to meet with each other in an attempt to solve their differences, relations between the Negro and white community rapidly deteriorated. Tensions between the two groups reached a climax on the evenings of March 27 and 28 when, during the course of massive civil rights demonstrations, the police arrested scores of individuals to accompanying cries of police brutality.

Some time prior to the March demonstrations the Mayor of Chester had appointed a Chester Commission on Human Relations which, after study, recommended that the school board integrate the faculties and develop a plan for integration of the elementary schools. The school board, however, remained adamant in its support of the existing pattern of neighborhood schools and seemed to foreclose any possibility that it might voluntarily take steps to alleviate the cause of discontent in the Negro community. With the almost total collapse of interracial good will fol-

lowing the March demonstrations, the Chester Human Relations Commission became defunct. Up to this time the Pennsylvania Human Relations Commission, while cooperating with the Chester commission, had not directly participated in the Chester problem. However, in mid April, at the specific request of former Governor William Scranton and the late Attorney General Walter Alessandroni, the Pennsylvania Human Relations Commission intervened and succeeded in temporarily halting the demonstrations. The commission also arranged a meeting on April 20, 1964, between the school board and civil rights leaders, but this meeting failed even to establish a framework for future discussions. Thereafter on April 22 and 24 the demonstrations were resumed; again mass arrests were made, many demonstrators were injured, and charges of police brutality were leveled.

With the crisis in Chester worsening, an emergency meeting was held in Philadelphia on Sunday, April 26. At this meeting, attended by the Governor, the Attorney General, the Mayor of Chester, the Chester City Solicitor, counsel for the Chester School Board and representatives of the Pennsylvania Human Relations Commission, it was decided that the commission would hold immediate public hearings on the charges of alleged racial discrimination in the Chester school system, that the commission would attempt to induce the parties to settle the controversy themselves, but that if necessary the commission would issue an appropriate order.

The participants in the April 26 meeting expected the civil rights groups would act as the complainants in the proceedings. However, when the public hearings commenced these groups declined to do so because of expressed uncertainties about the power of the commission to issue an effective order, and because they were afraid their participation in the hearings would prej-

udice their standing in the event they decided to file a court suit.[4] Under the circumstances the commission filed its own complaint wherein it set forth verbatim the same nine charges made by the civil rights groups in a letter addressed to the commission's general counsel. Public hearings were held on 4, 5, 6, and 14 May, 11 June, 17 and 29 September 1964. In addition on July 13 an off the record meeting was held between the commission and the representatives of the school district in an attempt to reach a solution without the necessity of issuing a formal adjudication and order. This attempt proved unsuccessful. On November 20, 1964, the commission issued its opinion, which included fifty-three findings of fact and eight conclusions of law. In its decision the commission dismissed two of the nine allegations charged in the complaint but found: "The respondent has committed and continues to commit unlawful discriminatory practices in violation of Sections 4(g), 5(a) and 5(i) of the Pennsylvania Human Relations Act, in that (1) respondent maintains segregated, all-Negro and substantially all-Negro public schools within its school system, (2) respondent has established public school zones which confine the Negro pupils to all-Negro schools, (3) respondent has failed to make available kindergartens in sufficient number to accomodate the children of Negroes living in Chester, (4) respondent assigns only Negro teachers and only Negro clerks to all-Negro schools, (5) respondent has permitted the physical condition of the all-Negro school buildings to be inferior to that of other school buildings in its system, and (6) respondent has failed to accept or adopt any affirmative plan whereby the public schools it administers will be effectively desegregated within

---

[4] When the Human Relations Act is invoked, the procedures and remedies provided therein are exclusive. Act of October 27, 1955, P. L. 744, §12, as amended, 43 P.S. §962.

a reasonable time." At the same time, the commission issued its final order wherein it directed the Chester School District to cease and desist from these practices and to take immediate corrective measures.

As provided for in §10 of the Pennsylvania Human Relations Act,[5] the school district appealed the commission's decision under the provisions of the Administrative Agency Law.[6] Initially, exceptions to twenty-six of the fifty-three findings of fact made by the commission, its conclusions of law, decision, and final order were filed, but several of these exceptions have since been abandoned. Specifically, the school district no longer objects to that part of the commission's order concerning its practice of assigning Negro clerks and teachers to all Negro schools nor with its failure to provide most Negro children with kindergartens, although with respect to the latter it continues to believe there was no legal or factual basis for the commission's conclusions. Indeed the school district claims to have made substantial progress regarding both complaints. Preserved for our review are the crucial questions of jurisdiction and whether the record supports the commission's finding that the neighborhood school system *as applied* in Chester violates the Pennsylvania Human Relations Act.

## II.   The Procedure Adopted

The school district takes the position that, in the absence of a complaint filed by an aggrieved individual, the commission possessed authority only to conduct an investigatory hearing but could not itself serve as the complainant or issue a final order. This procedural argument was rejected by the courts below; since we are in accord with the reasons expressed in the Dau-

---

[5] Ibid. §10, 43 P.S. §960.
[6] Act of June 4, 1945, P. L. 1388, 71 P.S. §1710.1 et seq.

phin County Court's opinion on this aspect of the controversy, 85 Dauph. at 22-25, 224 A. 2d at 818-20, there is no need to consider it anew.

## III.   The Commission's Jurisdiction

The school district does not suggest that it would be unconstitutional for the Legislature to command them to consider race in their districting proposals in order to achieve a semblance of racial balance in its schools, nor do we believe there would be any merit in such a contention. See *Jackson v. Pasadena City School Dist.,* 59 Cal. 2d 876, 382 P. 2d 878 (1963); *Guida v. Board of Educ. of New Haven,* 26 Conn. Supp. 121, 213 A. 2d 843 (1965); *School Committee of Boston v. Board of Educ.,* 227 N.E. 2d 729 (Mass. 1967); *Booker v. Bd. of Educ. of Plainfield,* 45 N.J. 161, 212 A. 2d 1 (1965); *Balaban v. Rubin,* 14 N.Y. 2d 193, 199 N.E. 2d 375, 250 N.Y.S. 2d 281, cert. denied, 379 U.S. 881, 85 S. Ct. 148 (1964); cf. *Hobson v. Hansen,* 269 F. Supp. 401 (D.C. D.C. 1967); *United States v. Jefferson County Bd. of Educ.,* 372 F. 2d 836 (5th Cir. 1966), aff'd en banc, March 29, 1967 (per curiam). But see *Tometz v. Board of Educ. of Waukegan City School Dist.,*      N.E. 2d      (Ill. June 20, 1967) (Dock. No. 40292—Mar. 1967). Rather its position is that the Legislature has not chosen to require this, and in the absence of such a directive, the school board need not consider race in drawing boundary lines.   The school district, while believing de facto segregation to be regrettable from an educational standpoint, views the solution as lying in the integration of the community's residential sections over which it has no control.

Both parties recognize the correctness of their respective views regarding the commission's jurisdiction depends upon the construction of the phrase "directly

or indirectly" in the context of the following statutory language: "It shall be an unlawful discriminatory practice . . . for . . . any place of public accommodation . . . to . . . Refuse, withhold from, or deny to any person because of his race, color, religious creed, ancestry or national origin, either directly or indirectly, any of the accommodations, advantages, facilities or privileges of such place of public accommodation. . . ." Pennsylvania Human Relations Act, §5 (i)(1), Act of October 27, 1955, P. L. 744, as amended by the Act of February 28, 1961, P. L. 47, 43 P.S. §955(i)(1). By virtue of §4, 19 P.S. §954, public schools are places of public accommodation.

In adopting the construction urged by the school district, the courts below reasoned: "As used in this particular statute, it is clear that the phrase 'either directly or indirectly' relates to and modifies the words 'refuse, withhold from, or deny.' Such words contemplate intentional or affirmative acts on the part of the wrongdoer," 85 Dauph. at 27, 224 A. 2d at 821. We cannot agree. To begin with the Legislature has specifically mandated in §12 that "the provisions of this act shall be construed liberally for the accomplishment of the purposes thereof." In our view a more reasonable construction of the disputed phrase would be that where, as here, the responsible party has the power to take corrective measures, indeed of necessity it must redistrict periodically, its failure to act amounts to the continued withholding from most Negro children the admitted advantages of an integrated education. Total nonaction by school boards is thus impossible and even seemingly neutral decisions frequently encourage de facto segregation.[7] Such a

---

[7] See note 12 infra and accompanying text. An analogy has been suggested in Kaplan, supra note 1 at 55, between the failure of school boards to alleviate racial imbalance and the failure of state legislatures to redistrict; in the latter case there is clearly

construction, of course, does not mean that a totally integrated school system must be achieved overnight or that Chester need abandon neighborhood schools but only that complete inaction under the circumstances of this case amounts to a denial of these advantages.

Along these lines, and without benefit of a similar statute, the California Supreme Court recently observed in considered dictum: "[E]ven in the absence of gerrymandering or other affirmative discriminatory conduct by a school board, a student under some circumstances would be entitled to relief where, by reason of residential segregation, substantial racial imbalance exists in his school. So long as large numbers of Negroes live in segregated areas, school authorities will be confronted with difficult problems in providing Negro children with the kind of education they are entitled to have. Residential segregation is in itself an evil which tends to frustrate the youth in the area and to cause anti-social attitudes and behavior. Where such segregation exists it is not enough for a school board to refrain from affirmative discriminatory conduct. The harmful influence on the children will be reflected and intensified in the classroom if school attendance is determined on a geographic basis without corrective measures. The right to an equal opportunity for education and the harmful consequences of segregation require that school boards take steps, insofar as reasonably feasible, to alleviate racial imbalance in schools regardless of its cause." *Jackson v. Pasadena City School Dist.*, 59 Cal. 2d 876, 881, 382 P. 2d 878, 881-82 (1963). See also *Barksdale v. Springfield School Committee*, 237 F. Supp. 543 (D. Mass.), vacated on other grounds, 348 F. 2d 261 (1st Cir. 1965).

The canons of statutory construction require that a statute be read in a manner which will effectuate its

___

an affirmative obligation to take corrective action, e.g., *Baker v. Carr*, 369 U.S. 186, 82 S. Ct. 691 (1962).

purpose, a task which compels consideration of more than the statute's literal words. E.g., *Chartiers Valley Joint Schools v. Allegheny County Bd. of School Directors,* 418 Pa. 520, 211 A. 2d 487 (1965) ; *Rossiter v. Whitpain Twp.,* 404 Pa. 201, 170 A. 2d 586 (1961) ; *New York Life Ins. Co. v. Guaranty Corp.,* 321 Pa. 359, 184 Atl. 31 (1936) ; Act of May 28, 1937, P. L. 1019, 46 P.S. §551. In ascertaining this legislative purpose, especially when the Act in question is a manifestation of a fundamental policy of the Commonwealth, courts may properly consider the historical setting which gave impetus to its enactment. See *New York Life Ins. Co. v. Guaranty Corp.,* supra; *Orlosky v. Haskell,* 304 Pa. 57, 155 Atl. 112 (1931) ; 50 Am. Jur. §295 (1944). Thus even if we assume arguendo that the interpretation we have adopted is not apparent solely from the wording of the statute, any latent ambiguity disappears once we examine the circumstances of its passage.

In 1954, the Supreme Court of the United States ushered in a new era of constitutional development when it held segregated educational facilities deprived children of minority groups the opportunity to obtain an education equal to that received by their Caucasian counterparts. *Brown v. Board of Educ.,* 347 U.S. 483, 74 S. Ct. 686 (1954). The consolidated cases decided in *Brown* involved areas where the state gave active support to a dual system of schools, and for several years the greatest emphasis was placed upon achieving compliance with the Supreme Court's mandate in the southern states. See, e.g., *Cooper v. Aaron,* 358 U.S. 1, 78 S. Ct. 1401 (1958). However, Negro leaders recognized that their children were not receiving equal educational opportunities in northern communities, where the schools were frequently segregated on a de facto basis, and in the late fifties they began to focus their attention on this problem. See, e.g., *Taylor v.*

*Board of Educ. of New Rochelle,* 191 F. Supp. 181 (S.D.N.Y.), aff'd, 294 F. 2d 36 (2d Cir.), cert. denied, 368 U.S. 940, 82 S. Ct. 382 (1961).

The legislative development of the Human Relations Act casts considerable light upon the legislative intention as it effects the present litigation. In 1955, the Pennsylvania Fair Employment Practice Commission was created to supervise the provisions of the then newly enacted Pennsylvania Fair Employment Practice Act.[8] When this act was amended in 1961 to include discrimination in housing and public accommodations, it was retitled the Pennsylvania Human Relations Act. The commission's name of course was also changed to reflect its broadened jurisdiction. Two of the 1961 amendments are especially pertinent here: (1) §5(i)(1), the section under which the commission has proceeded in the instant case, first became a part of our statutory law; (2) the Legislature amended the section dealing with its findings and declaration of policy so as to specifically refer to the evils resulting from racial segregation in the public schools. Section 2(a) now reads as follows: "The practice or policy of discrimination against individuals or groups by reason of their race, color, religious creed, ancestry, age or national origin is a matter of concern of the Commonwealth. Such discrimination foments domestic strife and unrest, threatens the rights and privileges of the inhabitants of the Commonwealth, and undermines the foundations of a free democratic state. The denial of equal employment, *housing and public accomodation opportunities* because of such discrimination, and the consequent failure to utilize the productive capacities of individuals to their fullest extent, deprives large segments of the population of the Commonwealth of earnings necessary to maintain decent

---

[8] Act of October 27, 1955, P. L. 744. .

standards of living, necessitates their resort to public relief and intensifies group conflicts, thereby resulting in grave injury to the public health and welfare, *compels many individuals to live in dwellings which are substandard, unhealthful and overcrowded, resulting in racial segregation in public schools and other community facilities, juvenile delinquency and other evils, thereby threatening the peace, health, safety and general welfare of the Commonwealth and its inhabitants.*[9]

Had the Legislature intended to reach by the 1961 amendments only de jure segregation, its legislative pronouncements would have been unnecessary. The 1954 *Brown* decision made it eminently clear that de jure segregation—racial isolation produced by the acts of public officials—is unconstitutional. A legislative pronouncement to this effect, and this effect only, would be mere gild on the lily.

Because the courts below found the underlying inequities, as expressed in this declaration of policy, not to include de facto segregation as such, it refused to conclude that the Legislature intended to grant the Commission jurisdiction over problems of racial imbalance. Instead the courts reasoned: "It is significant to note that the Legislature in this policy declaration states that 'racial segregation in the public schools' is *the result of* discrimination in the area of the denial of equal housing accomodations. . . . If by the enforcement of the Act discrimination in the areas of employment and housing is largely overcome, or through the recognition by man of the inherent worth of his neighbor regardless of race, creed or color, de facto segregation would to a substantial degree also be overcome as racial imbalance in the public schools is es-

---

[9] Ibid., as amended by the Act of February 28, 1961, P. L. 47, §1, 43 P.S. §952 (Additions in italics).

sentially a result of patterns of neighborhood school attendance districts." 85 Dauph. at 28, 224 A. 2d at 822. (Emphasis in original.)

In our view this is a vast oversimplification and does not adequately reflect the mandate that the statute be liberally interpreted to reflect its purpose. The restrictive construction placed upon this section by the courts below ignores completely the legislative conclusion that racial segregation in the public schools, whatever its source, threatens "the peace, health, safety and general welfare of the Commonwealth and its inhabitants."[10] There are many social and economic causes for the rigidified residential patterns which dominate our communities, and despite anti-discrimination laws the barriers to integrated housing are often difficult to breach.[11] Indeed the way to attack discrimination in housing and employment may be to begin with a program of quality integrated education.

---

[10] Compare the letter of President Lyndon B. Johnson to John A. Hannah, Chairman, U. S. Commission on Civil Rights, reprinted in, Racial Isolation in the Public Schools (U. S. Commission on Civil Rights 1967) iv: "[L]ong after we have done all we can to eliminate past inequities, we will continue to pay their costs in stunted lives. Because millions of Negroes were deprived of quality education and training in basic skills, because they were given to believe that they could aspire only to the most menial and insecure places in our society, they are seriously handicapped in taking advantage of opportunities afforded by new laws, new attitudes and an expanding economy. We can no longer tolerate such waste of human resources.

"Although we have made substantial progress in ending formal segregation of schools, racial isolation in the schools persists—both in the North and the South—because of housing patterns, school districting, economic stratification and population movements. It has become apparent that such isolation presents serious barriers to quality education."

[11] For a comprehensive study of the socio-economic causes of racial isolation, see Racial Isolation in the Public Schools (U. S. Commission on Civil Rights 1967) 17-77.

The best way to demonstrate the "inherent worth of [one's] neighbor" is to place individuals in a situation where they are exposed to their neighbor. This is especially true if a child can become aware of his neighbors' capabilities before his prejudices have had a chance to develop, but inter-racial cooperation may also have a beneficial effect on the thinking of adults. Thus, participation in such school activities as the P.T.A. may promote a better understanding which is the crucial first step toward the achievement of a truly integrated society. To paraphrase Mr. Justice HOLMES, one such experience may be worth several volumes of sociology.

In line with their interpretation of §5(i)(1), supra, the courts below also concluded that the last clause of the declaration of policy contemplated an affirmative "practice or policy" on the part of the actor. Yet seemingly neutral decisions by school officials, such as construction sites of new schools, school size, attendance zones, and methods of relieving overcrowded schools, frequently perpetuate racial isolation.[12] Moreover, some of the actions taken by the Chester School District can hardly be classified as neutral. For example, only after the commission issued its order in the present case did the school board abandon its practice of assigning only Negro teachers and clerks to all-Negro schools, although the consideration of race in faculty assignments is violative of *Brown* and precludes the establishment of an integrated school system.[13] As one federal district court recently phrased it: "[T]he presence of all Negro teachers in a school attended solely by Negro pupils in the past denotes that school a 'colored school' just

---

[12] See ibid. at 44-59.

[13] See, e.g., *Bradley v. School Bd. of Richmond*, 382 U.S. 103, 86 S. Ct. 224 (1965); *Smith v. Board of Educ. of Morrilton*, 365 F. 2d 770, 778 (8th Cir. 1966).

as certainly as if the words were printed across its entrance in six-inch letters." *Brown v. County School Bd. of Frederick County,* 245 F. Supp. 549, 560 (W.D. Va. 1965).

Finally, we must be cognizant of the consequences of a particular interpretation. Act of May 28, 1937, P. L. 1019, §51, 46 P.S. §551. The interpretation adopted by the courts below would almost totally deprive the Commission of effectiveness in the area of racial imbalance, for as the New York Court of Appeals observed in an early case interpreting New York's antidiscrimination law: "One intent on violating the Law Against Discrimination cannot be expected to declare or announce his purpose." *Holland v. Edwards,* 307 N.Y. 38, 45, 119 N.E. 2d 581, 584 (1954). Pennsylvanians are justly proud of this Commonwealth's leadership in promoting equal opportunities for all its citizens, and we believe it to be more than coincidental that the 1961 amendments were adopted at a time when many educators and sociologists were giving serious attention to the educational problems posed by de facto segregation.

Nor do we find the counter arguments advanced by the school district against the construction we have adopted persuasive. Essentially, the school district believes commission jurisdiction in this area will result in the usurpation of its functions under the Public School Code. While the school district agrees that if it were guilty of purposeful discrimination (a question we do not now pass upon), the commission could issue a cease and desist order, it contends that "regardless of the commission's findings, its order must be limited to requiring the end of the discriminatory practice." But if the commission can order an end to the discriminatory practice, it must be able to do so effectively; indeed the simple answer to the school district's contention is found in §9 of the Human Rela-

tions Act which not only instructs the commission to enter affirmative orders but also requires those in violation of the act to file a report indicating the manner of compliance.

In particular the school district is concerned that the commission's order will result in forcing them to adopt a system of busing and in the destruction of the neighborhood school system. In order to prevent this they urge us to hold that the commission is without jurisdiction over problems of racial isolation. We are not at all convinced these fears are justified, but in any event they do not warrant our subverting the legislative goal.

Because of acute overcrowding in certain schools, the Chester School District has found it necessary, for several years prior to the hearings in this case, to transport a number of its pupils out of their neighborhoods to less crowded schools, and in at least one instance, to temporary classrooms in a housing project. Under the Public School Code a school district need not provide transportation for pupils who live within a mile and a half of their schools.[14] Since the City of Chester, with eleven elementary schools and four junior high schools, is only three miles wide, it would seem that the threat of additional mass busing would not be a serious handicap to the integration of its public schools, a conclusion with which several of the school district's witnesses agreed. Moreover, at no time during the hearing did the commission urge Chester officials to utilize extensive busing as a means of alleviating its racial imbalance. Indeed under the so-called Wolff plan, which was submitted by one Dr. Max Wolff[15] and was received favorably by the com-

---

[14] See *Landerman v. Churchill Area School Dist.*, 414 Pa. 530, 200 A. 2d 867 (1964).

[15] Dr. Wolff, a community consultant and educator has in recent years specialized in developing programs aimed at the effective

mission, there would have been a substantial savings to the school district because, according to its author, there would be no need to bus any pupils. Although a witness later disputed Dr. Wolff's conclusions about busing, even he conceded that, under his interpretation of the Wolff plan, only $2,000 more, or about an 8% increase, than was currently being expended for busing would be needed.

The argument that the commission's order will destroy the neighborhood school system completely distorts the historical rationale of neighborhood schools. Traditionally, the neighborhood school has been an exercise in democracy, "a single structure serving a heterogeneous community in which children of varied racial, cultural, religious, and socio-economic backgrounds were taught together—the proverbial melting pot."[16] One educator has recalled: "Most men and women over 40 recall a childhood schooling in which the sons and daughters of millowners, shop proprietors, professional men, and day laborers attended side by side. School boundaries, reaching out into fields and hills to embrace the pupil population, transcended such socio-economic clusterings as existed."[17]

However, increasing population density in our nation's urban areas have caused neighborhoods to shrink drastically until today convenience is the most common justification for school attendance zones. Thus, "because of rigid racial and socio-economic stratification, ethnic and class similarity has become the most

---

desegregation of public schools. He has testified for the proponents of desegregation in litigation involving, among others, the cities of New Rochelle, N. Y., Gary, Ind., and Plainfield, N. J.

[16] Carter, De Facto School Segregation: An Examination of the Legal and Constitutional Questions Presented, 16 West-Res. L. Rev. 502, 507 (1965).

[17] Quoted in Racial Isolation in the Public Schools, supra note 11 at 40.

salient present-day neighborhood characteristic, particularly in urban areas. The neighborhood school, which encompasses a homogeneous racial and socioeconomic grouping, as is true today, is the very antithesis of the common school heritage."[18] Rather than neighborhood schools, we have all too frequently developed a system of ghetto schools. Integration need not see the demise of neighborhood schooling, although unquestionably new patterns of districting will have to occur. Thus, the commission found Chester to be at the best a three neighborhood community and Dr. Wolff testified that he believed the school board by proper planning could offer every child the true benefits of the neighborhood school. Up to now, however Chester has not begun to realize this potential.

The Human Relations Commission's primary function is to assure compliance with the act through "conference, conciliation and persuasion."[19] Only after this approach has failed, is it empowered to hold hearings, make findings of fact, and issue a final order. Such a procedure was followed in the instant case.

## IV. The Evidence

Having concluded that the commission's view of its jurisdiction is correct, we turn to a consideration of the evidence adduced at the hearings. There can be no serious doubt that the education offered pupils in all-Negro or substantially all-Negro schools is inherently inferior to that offered in integrated schools.[20] Even the Chester School District's brief contains sev-

---

[18] Carter, supra note 16 at 507.

[19] Act of October 27, 1955, P. L. 744, §9, as amended, 43 P.S. §959.

[20] See, e.g., Racial Isolation in the Public Schools (U. S. Commission on Civil Rights 1967) ; Equality of Educational Opportunity (U.S. Office of Education 1966).

eral passages which support this basic proposition, such as: "'As to the racial intermingling of the children, solely because of their different color, the School District agrees that as a matter of morals and better educational standards it is better, where it is reasonably possible to do so, to have no all-Negro or predominantly all-Negro schools.'"

One of the school board's witnesses, the principal of Douglass Junior High School, described the disadvantages of a segregated education in the following terms: "Students are a product of the learning experiences which are provided for them, their experience of interacting with people of various backgrounds socially, economically and culturally. Just as you don't learn to swim by just looking at a swimming pool and without ever getting into it, you don't learn to understand people unless you associate with them. Learning is not confined to just the direction which is given to four walls of a classroom. Children learn through their association with each other in the cafeteria, eating lunch together. They learn through going on class trips together, journeys and educational excursions. They learn in the way in which they appreciate programs. They learn in the way in which they work together on committees in preparing class projects. And there is no way that a teacher, no matter how excellent she is, there is no way that he or she can give a child this experience."

Under the circumstances we need not consider the extent to which the Chester School District was responsible for the existing condition. We note only that there was evidence which suggests, in the words of the commission, "that the segregation of the public schools in Chester is not entirely accidental."[21] While

---

[21] Prior to 1954, school segregation in Chester apparently had official sanction. See, e.g., Report to Board of School Directors of the City of Chester, March 9, 1964, Complainant's Exhibit No. 15.

these findings add weight to its adjudication on the de facto issue, we need not, and do not decide, whether its conclusion that the school authorities purposefully perpetuated the existing segregated structure meets the substantial evidence test.[22]

The commission's final order of November 20, 1964, contained seven provisions. Nos. 1-4 ordered the school district to cease and desist from following practices which had resulted in the substantial segregation of the faculties and staffs; the school district has abandoned its objections to these portions of the final order. No. 5 ordered the school district to establish kindergartens in three all-Negro schools, and while it objects to the propriety of this order, the school board does not press its challenge here; indeed, according to its brief, it has already established six additional kindergartens. No. 7 required the school district to take certain affirmative action which, in the commission's judgment, would effectuate the purpose of the Human Relations Act and to file a report with the commission indicating the steps taken in compliance with the order. No. 7 also is not challenged except for those portions which require the school district to formulate a plan for the alleviation of racial imbalance in its schools.

---

[22] With respect to the quantum of evidence necessary to support a finding of purposeful segregation under the Fourteenth Amendment, compare *Dowell v. School Bd. of Oklahoma City*, 244 F. Supp. 971 (W.D. Okla. 1965), aff'd, 375 F. 2d 158 (10th Cir. 1967), with *Downs v. Board of Educ. of Kansas City*, 336 F. 2d 988 (10th Cir. 1964), cert. denied, 380 U.S. 914, 85 S. Ct. 898 (1965); compare *Taylor v. Board of Educ. of New Rochelle*, 191 F. Supp. 181 (S.D.N.Y.), aff'd, 294 F. 2d 36 (2d Cir.), cert. denied, 368 U.S. 940, 82 S. Ct. 382 (1961), and *Blocker v. Board of Educ. of Manhasset*, 226 F. Supp. 208 (E.D.N.Y. 1964) with *Bell v. School Board of City of Gary*, 213 F. Supp. 819 (N.D. Ind.), aff'd, 324 F. 2d 209 (7th Cir. 1963), cert. denied, 377 U.S. 924, 84 S. Ct. 1223 (1964).

Thus, for the purposes of this appeal, the key provision is No. 6, wherein the commission ordered: "That the respondent, Chester School District, by and through the Chester School Board, its officers, agents and employes, shall take immediate steps to desegregate effectively the all-Negro Douglass Junior High School, and the following all-Negro or substantially all-Negro elementary schools: Dewey-Mann, Franklin, Lincoln, Washington and Watts." At the time of the hearing the racial composition of the schools in question was:

|  | White | Negro | Total | %Negro |
|---|---|---|---|---|
| Douglass | 1 | 527 | 528 | 99+ |
| Dewey-Mann | 0 | 823 | 823 | 100 |
| Franklin | 10 | 1018 | 1028 | 99 |
| Lincoln | 69 | 490 | 559 | 87 |
| Washington | 0 | 782 | 782 | 100 |
| Watts | 0 | 344 | 344 | 100 |

Clearly, the above figures, which are not disputed, satisfy any definition of de facto segregation. But because "racial imbalance" is not precisely defined, in the Human Relations Act, the school district argues that the Legislature has failed to provide adequate standards within which the commission may act; thus, it suggests there has been an unconstitutional delegation of authority. We find this contention to be without merit; for as early as 1872, this Court stated: "The legislature cannot delegate its power to make a law; but it can make a law to delegate a power to determine some fact or state of things upon which the law makes, or intends to make, its own action depend." *Locke's Appeal,* 72 Pa. 491, 498 (1873); cf. *Chartiers Valley Joint Schools v. Allegheny County Bd. of School Directors,* 418 Pa. 520, 211 A. 2d 487 (1965), and authorities analyzed therein. Should the commission at some future date abuse its authority, the Administrative Agency Law provides adequate protection.

Moreover, having expressed its findings and goals in an early section, the Legislature undoubtedly envisioned a case-by-case approach to the elimination of racial imbalance in public schools. Most observers agree that when courts are forced to devise and supervise programs whose goal is the elimination of racial imbalance they are acting in an area alien to their expertise.[23] These observers would prefer to see de facto segregation attacked by the community itself utilizing other organs of the government. The Human Relations Commission, whose function is to work with the parties to the dispute in an attempt to alleviate the source of the friction through "conference, conciliation and persuasion," and whose procedure is considerably more flexible than the courts, is, as the Legislature recognized, better equipped to deal with this problem than the courts. "In each case, the interests protected by adherence to neighborhood attendance zones must be weighed against the substantiality of the racial imbalance in the community's schools. An agency such as the Human Relations Commission is best equipped to make these difficult judgments, and flexible enough to enter appropriate remedial orders."[24]

The commission's handling of the instant case illustrates its acute awareness of the complexities involved in the desegregation of a school system. Both the commission and its witnesses recognized that long range planning was necessary if Chester was ever to enjoy a truly integrated school system, and total integration was not expected to blossom overnight.[25] What the

---

[23] See, e.g., *Hobson v. Hansen*, 269 F. Supp. 401 (D.C. D.C. 1967) (WRIGHT, J.) ; *Taylor v. Board of Educ. of New Rochelle*, 191 F. Supp. 181, 197 (S.D. N.Y. 1961) (KAUFMAN, J.).

[24] Instant case, 209 Superior Ct. at 46-47, 224 A. 2d at 816 (dissenting opinion).

[25] For example, while Dr. Wolff's plan called for the integration of all elementary grades past the fourth and the junior high

commission did seek, in addition to long range planning, was the formulation of an immediate program which would eliminate the worst pockets of racial isolation.[26] But the commission did not order the authorities to adopt any particular program,[27] for in its view,

school by the opening of the new school year in September 1964, he recognized that more time would be necessary in order to achieve total desegregation of the elementary schools.

[26] On July 13, 1964, the school district for the first time did submit a proposal of its own. The commission, however, found this plan wanting because it did not attempt to resolve the crucial issues of the proceeding, viz., the desegregation of the six named schools: "The School Board proposals do not attempt, other than by vague and indefinite language unsupported by any important details, to propose an effective method whereunder this Commission can be reasonably certain that the all-Negro schools in Chester will be entirely desegregated according to a definite timetable." We believe the commission's judgment here is fully justified.

[27] In formulating a plan of desegregation, the commission's order urged "the respondent carefully and seriously to consider the following guidelines:

"(1) The plan must state all details as to the school or schools to be replaced, converted or repaired, including but not limited to costs, proposed methods of obtaining the required funds, and actual dates when the proposed construction or alterations will be commenced and completed; (2) If the plan proposes conversion of a present school facility, it must also state with particularity the boundary lines which will define the school zone for such converted school, the number of children required to be bused to such school, and the cost of such busing; (3) If the plan proposes construction of new school buildings, it must state specifically all details concerning the exact sites at which such buildings will be erected, the boundary lines which will define the school zones for each such new school, the number of children required to be bused to each such school, and the cost of such busing; (4) For short range and immediate action, the plan could embody any or all of the following: (a) The adoption of new boundary lines creating new zones which would desegregate some of the segregated schools; (b) The creation of middle or intermediary schools for all 5th and 6th grade pupils, to desegregate such grades; (c) The establishment of a single junior high school complex in the central part

and ours, the school district bears primary responsibility for the choice and implementation of an effective desegregation program. At the same time, the commission properly retained jurisdiction.[28]

The Administrative Agency Law permits us to set aside or modify the commission's adjudication only in those instances where the findings of fact necessary to support its adjudication are "not supported by substantial evidence." Act of June 4, 1945, P. L. 1388, §44, 71 P.S. §1710.44; see *Blairsville Nat'l Bank v. Myers,* 409 Pa. 526, 187 A. 2d 655 (1963); *Pennsylvania State Bd. of Medical Educ. v. Schireson,* 360 Pa. 129, 133, 61 A. 2d 343, 346 (1948). For the reasons stated we are abundantly satisfied that the commission's crucial order, No. 6, is supported by substantial evidence. Accordingly it would serve no useful purpose for us to determine whether any one of the findings of fact specifically objected to by the School District is indeed "arbitrary and capricious," because such a conclusion with respect to an individual finding would not alter the validity of the contested adjudication.

In its final order, the commission instructed the school district to submit a plan for the desegregation of the six named schools by January 31, 1965. This date, of course, has long since passed. Under the circumstances, we shall remand the record to the Pennsylvania Human Relations Commission with instructions to set a new date for the submission of a plan by the Chester School District, and if necessary to modify its order in light of any intervening circumstances.

---

of Chester, similar to the present senior high school arrangement. which would desegregate the all-Negro Douglass Junior High School."

[28] Compare *Brown v. Board of Educ.,* 349 U.S. 294, 75 S. Ct. 753 (1955).

The order of the court below is modified and those provisions of the Pennsylvania Human Relations Commission's order directed at racial imbalance in the Chester schools are reinstated.

Record remanded with instructions.

Mr. Justice JONES dissents.

Mr. Justice COHEN took no part in the consideration or decision of this case.

---

DISSENTING OPINION BY MR. CHIEF JUSTICE BELL:

Article X, Section 1, of the Pennsylvania Constitution provides: "The General Assembly shall provide for the maintenance and support of a thorough and efficient system of public schools wherein all the children of this Commonwealth may be educated." The General Assembly in and by the Public School Code of 1949* has created school districts to act as agents in carrying out this Constitutional mandate. These school districts act through boards of school directors, the members of which in most districts in Pennsylvania are elected by the voters to administer the school district. The code imposes on school districts and on their boards of school directors certain mandatory duties and certain discretionary powers. These include the duty to provide grounds and buildings (§701), and also the duty to assign pupils to the various schools within the district, but makes it unlawful (as does the Pennsylvania Human Relations Act, infra) "for any school directors, superintendent, or teacher to make any distinction whatever, on account of, or by reason of, the race or color of any pupil" (§1310).

It is clear, therefore, that under the Public School Code school directors have the power and the duty to determine where schools shall be built and where the pupils shall be assigned, so long as no distinction or

---

* Act of March 10, 1949, P. L. 30, 24 P.S. §1-101 et seq.

discrimination is made for or against pupils by reason of race or color. It is equally clear that no change in these powers and duties was made by the Pennsylvania Human Relations Act of October 27, 1955, P. L. 744, 43 P.S. §951 et seq., which we shall now consider.

### Facts, Acts and Basic Errors

Considering these in inverse order, the basic errors of the Majority in interpreting this Act are threefold: (1) It treats the Pennsylvania Human Relations Commission as a statewide *super-school board*; and (2) the Act, except by a Procrustean stretch of the English language, gives no authority to the commission to compel what amounts to a destruction or end of the "neighborhood school" which has been a traditional and very important cog in the wonderful development of our local communities, our State and Nation; and (3) the commission made no findings of fact which were adequate to support its Order or the Majority's Opinion. For example, there was no evidence and certainly no substantial evidence that the Chester School Board created racial imbalance by *intentionally or purposely* discriminating against Negroes in its buildings or in its assignment of students to the various schools in the School District of Chester.

The commission (1) merely found the well known and indisputable fact that racial imbalance (sometimes called "de facto segregation") exists in the Chester school system, and particularly in the six named schools, and (2) issued an Order requiring the Chester School Board to propose and, with the commission's approval, take steps to immediately and effectively desegregate these six schools in order to eliminate all the racial imbalance which exists de facto therein. In practical effect, this amounts to a mandatory ending (by the commission) of the "neighborhood school", and

the mandatory transplanting of countless children who attend public (and necessarily the parochial) schools in Pennsylvania. The Dauphin County Court, sitting as a Commonwealth Court, held that this Order of the commission exceeded the authority granted by the Legislature to the Pennsylvania Human Relations Commission, and the Superior Court affirmed (with two Judges dissenting).

The real basic question is whether in the absence of a finding supported by substantial evidence that the school district has intentionally discriminated against its pupils or prospective pupils because of their race, creed or color, the commission can usurp the province and functions of a board of school directors and require the school board to locate its schools and assign pupils thereto as the commission deems wise for color or racial or religious reasons.

I strongly agree with the decision of the Dauphin County Court and of the Superior Court. There is no legislative or Constitutional authority to support the Majority Opinion or decision which can be reached and justified only by a farfetched stretch of the English language.

The Chester school system is set up on a neighborhood school basis—i.e., students are assigned to the school which in the opinion of the Chester School Board is most nearly or easily accessible to the student. The racial imbalance in the Chester schools is unquestionably due to the racial imbalance in the various neighborhoods *where the children reside,* which in turn is undoubtedly the result of many different factors. *It is agreed by everyone that the Chester School Board did not create and is not responsible for, nor can it change or eliminate such neighborhood racial imbalance.*

The Pennsylvania Human Relations Commission is given by the Legislature certain powers, but, we re-

peat, it is not given authority either under the Constitution or under this or any other Act to be a super-Board of Education or to usurp and, in practical effect, eliminate the province and the fundamental functions and powers of the school board.*

The Majority rely on four sections of the Act— 4(g), 5(a), 5(i) and 12(a)—to support the Commission's authority to order and *compel an end to all de facto racial imbalance,* even though such imbalance was not created by the school board but was the result of the residential neighborhood. A careful analysis of these statutory provisions demonstrates that they *do not* and cannot by any reasonable construction support the Majority's distorted interpretation.

Section 5 of the Act, upon which the appellant and the Majority principally rely, provides in pertinent part, that "it shall be an *unlawful discriminatory practice*** . . . for any place of public accommodation [defined in §4 to include 'public schools'] . . . to . . . *refuse, withhold from or deny* to any person *because of his race, color,* religious creed . . . either *directly* or *indirectly,* any of the accommodations, advantages, facilities or privileges of such place of accommodation." The key words in the *prohibition of unlawful discrimination are "to refuse . . . any accommodations . . . because of his race, color or religious creed."* It is only when accommodation is *intentionally refused or denied* directly or indirectly, *because* of color, etc., that discrimination is declared to be *unlawful* and is prohibited by the Act. This key language the Majority change or distort (1) by reference to the broad general policy of the Act which is set forth in its preamble and (2) by §12(a) which says the Act should be liberally construed—*not rewritten.*

---

* I believe, although it is not clear, that the Majority impliedly admit this.

** Italics throughout, ours.

The Majority Opinion, in construing §5, completely ignores the accompanying clear and controlling language of §5, namely, the denial of school accommodations must be because of color or race. The Majority's construction is not only realistically unwise in the light of our Country's history, in which neighborhood schools have provided the interest, the friendships, the pride and the development of local neighborhoods and businesses, but even more important, finds, we repeat, no support in the Acts of the Legislature* or in the Constitution.

As the educational achievements of the citizens of this Commonwealth (and indeed, throughout our entire Country) have demonstrated, this public school system has for some two hundred years served the Commonwealth (and our Country) exceptionally well, and should not be drastically changed or abandoned unless *the Legislature clearly, specifically and unequivocally said so.*

Moreover, resort by the Majority to §12(a) (i.e., the Act should be liberally construed) cannot possibly extend the coverage of the Act to areas or situations not encompassed or provided for by any section or by any language of the Act. Specifically, it cannot supply authority to the commission to act in circumstances and in situations where the commission or a majority of this Court believe the Legislature *should have,* but *did not,* empower it to act.

Expressed in other words, the Majority have *rewritten* the Act to require policies and actions which

---

* We note that the Legislature, in its recent School Bus Act of June 15, 1965, P. L. 133, which amended the Public School Code which this Court sustained in *Rhoades v. Abington School District*, 424 Pa. 202, 226 A. 2d 53, staunchly supported the neighborhood school because it promoted better school attendance, reduced the distance pupils must travel, and provided better health for the pupils and more safety from the hazards of traffic.

they believe are socially or politically desirable, completely oblivious of the fact that under our Constitution and its guaranteed Republican Form of Government, it is the ordained and fundamental province, power and duty of the Legislative branch of the Government to determine and enact legislation, and that is not the province or function of the Courts.

### Inadequate Standards

Racial imbalance undoubtedly exists (as above noted) in some of the schools operated by the Chester School Board which are in fact either almost all or predominantly Negro, or almost all or predominantly white. For example, in the Chester elementary school system, the school population is approximately 65 per cent "Negro" and 35 per cent "white." Without *Legislative standards*—not even definitions were given or guidelines erected—it is impossible to know whether a school that is 85 per cent "Negro," or 75 per cent, or 65 per cent or 60 per cent "Negro" would be considered as racially imbalanced. Without any standards and without any definition of "Negro" or "white", how is it possible to determine whether a person who is one-third or one-half or two-thirds, or some part Negro would be considered as either a "Negro" or a "white" person for school purposes? Surely the Legislature would have dealt clearly, certainly and definitely with these and numerous other problems inherently involved and knowingly existing, if it had intended to *end per se, de facto racial imbalance in the public schools.* Moreover, I believe the Majority has not sufficiently carefully considered the important question of whether the delegation of powers (which they envision) to the commission is unconstitutional. See *Holgate Brothers Co. v. Bashore,* 331 Pa. 255, 200 Atl. 672.

I believe that the *commingling* of all kinds and so-called classes of society—the rich and the poor, the

188

people of all faiths and creeds, the white, the black, the red, the yellow and brown—makes for a better America! But I further believe that it is a gross distortion and misnomer to call this *friendly social and business and political* "commingling", "Education." I strongly disagree with much of the social and political philosophy expressed by the Majority in support of its interpretation of the Human Relations Act, the passage of which was motivated more by political than educational considerations.

To pile Pelion upon Ossa, the Administrative Agency Law (June 4, 1945, P. L. 1388, 71 P.S. §1710 et seq.) permits a Court to set aside or modify the commission's Orders only in those cases where the findings of fact necessary to support the Orders or adjudications of the Commission are "not supported by *substantial* evidence." There were no factual findings by the Commission which are necessary to support its Orders, i.e., findings of *intentional* discrimination by the school board because of race or color, and consequently no substantial evidence to support the commission's conclusions, Orders or adjudication.

I further note that the Majority's decision goes far beyond any decision of the Supreme Court of the United States in the field of Education, and I reserve the right to pass upon the Constitutionality of the Act in connection with the power of the commission over public schools and school boards.

To summarize: The short and irrefutable answer to the Majority's Opinion is that *if* the Legislature had intended the drastic change envisioned by the Majority, namely, to end all de facto per se racial imbalance, which it knew (and everyone knows) exists in many public schools, it would not only have set up and provided definitions, guidelines and standards, but even more important it would have clearly and specifically said so! ! !

For these reasons, I dissent.