Chester Housing Authority *v.* Human Relations
Commission.

Argued January 8, 1973, before President Judge
BOWMAN and Judges CRUMLISH, JR., KRAMER, WILKINSON, JR., MENCER, ROGERS and BLATT.

*Francis G. Pileggi*, with him *Pileggi and Desmond*, for appellant.

*Stanton W. Kratzok*, Counsel, with him *J. Shane Creamer*, Attorney General, for appellee.

OPINION BY JUDGE CRUMLISH, JR., June 11, 1973:

The Pennsylvania Human Relations Commission directed the Chester Housing Authority to reform its present tenant selection and assignment procedures and to take affirmative action to alleviate the racial imbalance at its housing facilities.

In a letter dated July 13, 1971, the Chairman of the Pennsylvania Human Relations Commission [Commission] notified the Chairman of the Chester Housing Authority [CHA] that a public hearing would be conducted on August 5, 1971, to receive testimony relative to a Commission-initiated Complaint.[1] The Complaint alleged that CHA had in the past "maintained and continues until the present time to maintain housing projects under its supervision and control which are segregated by the race of the tenants therein" and that its failure to take corrective measures constituted an un-

---

[1] Section 3(f) of the Pennsylvania Human Relations Act, Act of October 27, 1955, P. L. 744, as amended, 43 P.S. §951, authorizes the Commission to initiate a complaint.

lawful discrimination practice in violation of Section 5(h)(1) of the Pennsylvania Human Relations Act. The Complaint further alleged that such discriminatory practice by CHA "effectively aids and abets the continuing segregation of students within the public schools in the City of Chester" in violation of Section 5(e) of the Act.

After the filing of the complaint, the Commission conducted an investigation and as a part thereof examined the files and policies of CHA and as a result determined that probable cause existed for crediting the allegations of the complaint.

A public hearing was conducted on August 5, 1971 after which the Commission unanimously determined that CHA had engaged in discriminatory practices in violation of Sections 5(h)(1) and 5(e) of the Pennsylvania Human Relations Act.

CHA appeals to us.

At the outset, we feel compelled to note that the record in this case is very disorganized and at times approaches incoherence which makes effective appellate review in this inherently complex and vital area at best difficult. Unless this Court is supplied with a comprehensive, coherent record, significant and damaging delays in the administration of justice will result. Having spoken, we now focus our attention on the merits of the case.

CHA was created under the Housing Authorities Law[2] and is authorized to construct, own, maintain and operate federally assisted low rent housing in the City of Chester, including those projects known as Lamokin Village, Ruth L. Bennet Terrace Homes, William Penn Homes and McCaffery Village pursuant to 42 U.S.C. §1401 et seq.

---

[2] Act of May 28, 1937, P. L. 955, Section 1, as amended, 35 P.S. §1541 et seq.

In the summer of 1969, the racial composition of these projects was as follows:

| | | | |
|---|---|---|---|
| Lamokin Village | 346 Blacks | 0 | Whites |
| McCaffery Village | 0 Blacks | 347 | Whites |
| Ruth L. Bennet Homes | 385 Blacks | 0 | Whites |
| William Penn Village | 257 Blacks | 20 | Whites |

The thrust of the Commission's allegations and the final decision is that the tenant selection and placement process employed by CHA resulted in black applicants having the opportunity to rent apartments only in those facilities predominantly housing black families.[3] The selection process, the Commission held, was discriminatory and in contravention of the Pennsylvania Human Relations Act.

CHA contends that the Commission erred in its determination that CHA discriminated in providing housing on the basis of racial considerations because:

1. The acts charged to CHA by the Commission (assuming competent proof) do not violate any provision of the Pennsylvania Human Relations Act;

2. The Pennsylvania Human Relations Act does not preempt provisions of federal and state statutes relating to low-cost housing;

3. The Commission's findings of fact and conclusions of law were not supported by substantial evidence; and

4. The Commission's order is unenforceable.

We strike down the appellant's first three contentions. With the fourth, in part, we agree.

The Order of the Commission:

"FINAL ORDER

"AND NOW, this 24th day of April, 1972, upon consideration of the foregoing Findings of Fact, Conclu-

---

[3] The Commission also stresses the converse that is that whites were denied the opportunity to rent available apartment space in the black projects.

sions of Law, Commission's Decision and pursuant to Section 9 of the Pennsylvania Human Relations Act, it is hereby

"ORDERED

"That Respondent Chester Housing Authority, its agents, servants, employees and each of their respective successors:

"1. Shall cease and desist from employing its present tenant selection and assignment procedures.

"2. Shall cease and desist from renting housing accommodations in McCaffery Village to white tenant families until the racial composition of said project reflects the ratio of negro to white tenant families in all public housing projects under Respondent's supervision, direction and control.

"3. Shall cease and desist from renting housing accommodations in Lamokin Village, William Penn Village and Ruth L. Bennett Homes to negro tenant families until the racial composition of each of said projects reflects the ratio of white to negro tenant families in all public housing projects under Respondent's supervision, direction and control.

"4. Shall develop and submit to the Pennsylvania Human Relations Commission (at its Regional Office, Room 101, State Office Building, Broad and Spring Garden Streets, Philadelphia, Pennsylvania) for its approval, within 60 days of the effective date of this Order, an affirmative action program designed to achieve in Respondent's public housing projects the racial composition as set forth in Paragraphs 2 and 3 above, and upon obtaining said approval, forthwith to effectuate said program. Said plan shall include, but not be limited to preoccupancy and post-occupancy counseling and the establishment of tenant councils.

"5. Shall, in writing, inform all applicants and all present tenants of this Final Order and the content thereof.

"6. Shall, beginning with the effective date of this Order, submit written offers to rent accommodations in its public housing projects to all applicants and require all replies thereto to be in writing, maintaining a permanent record of such offers and replies in its files.

"7. Shall, from the effective date of this Order, utilize the services of the intergroup specialist of the Equal Opportunity Staff of the U. S. Department of Housing and Urban Development and the consultative services of the Pennsylvania Human Relations Commission.

"8. Shall report to the Pennsylvania Human Relations Commission at its Regional Office as above set forth, beginning one month from the effective date of this Order, and monthly thereafter until such time as the racial composition in each project, as set forth in items 2 and 3 above, is achieved. Such report to contain information regarding the racial composition of each of its housing projects, as well as a list of all applicants, transfers, assignment and re-assignments of all units in all said projects under its supervision, direction and control by racial identification and reflecting the ratio of negro and white tenant families as set forth in paragraphs 2 and 3 above, family size and size of unit requested and assigned, list of vacancies in each project and, thereafter, shall for a further period of two years, make such reports quarter-annually.

"9. Shall, within 90 days of the effective date of this Order, establish objective written standards for the approval of applicants and assignment of units, copies of said standards to be submitted to the Pennsylvania Human Relations Commission (as set forth above) for its approval.

"10. Shall meet with the Chester School District for discussion and drafting of a plan for a priority selection system for the placement of tenants with school-age children in Respondent's housing projects which

placement will facilitate the desegregation of the schools of Chester School District and which shall be made to the Pennsylvania Human Relations Commission (as above set forth), within 180 days of the effective date of this Order, for its approval, whereupon same shall be forthwith effectuated."

Looking at the Commission's findings, we see its concern for tenant selection procedures which result in blacks being offered apartments only available in the black housing projects, and whites' apartments only in the predominantly white project. This, in the Commission's eyes, is a discrimination prohibited by the Pennsylvania Human Relations Act.

The appellant contends that the Human Relations Act simply prohibits a *refusal* to lease based on racial discrimination, and that in fact CHA has never refused to rent due to one's racial extraction. At the worst, assuming that the Commission can prove CHA does undertake such policies, it merely funnels blacks into black projects and whites into white projects according to CHA.

The pertinent section of the Human Relations Act at issue here is Section 5. Section 5 declares it to be an unlawful discriminatory practice

"(h) for any person to

"(1) *Refuse* to sell, lease, finance or otherwise to deny or withhold commercial housing because of the race, color . . . of any prospective . . . occupant or user of such commercial housing. . . ." (Emphasis added.)

We are fortified in our conclusion that appellant has construed the language of §5(h)(1) too strictly by a careful reading of §5(h)(1) and by other relevant sections of the Act.

Appellant suggests that unless there is a complete refusal to rent to a black there can be no violation of the Act. Let us examine appellant's rationalization. When a black person is told by CHA that there is no

apartment space available when in fact there is space available at the white project, at that precise moment there is a *refusal* to rent because of the race of the prospective occupant, which specifically defies Section 5 of the Human Relations Act. To say as appellant does, that a later offer of space to the same black person within the black housing project when and if it becomes available erases the racial discrimination initially practiced is to clothe this Court with naivete which we are unwilling to accept. Moreover, acceptance of appellant's tight interpretation of the term "refuse to lease" would also cause us to decimate the legislature's obvious pronouncement that the provisions of the Pennsylvania Human Relations Act ". . . shall be construed liberally for the accomplishment of the purposes thereof. . . ." 43 P.S. §962(a).

Also and very simply, we feel that denying blacks the opportunity to rent apartments in the white housing projects fits squarely within §5(h)(1) which prohibits "withhold[ing] commercial housing because of the race" of any prospective owner (tenant or occupant).

Appellant's second contention is that the Pennsylvania Act does not preempt provisions of federal and state statutes relating to low-cost housing. This appears to relate to CHA's primary defense at the Commission hearing, that CHA followed a tenant selection plan structured by the United States Department of Housing and Urban Development [HUD] which was designed to effectuate Title VI of the Civil Rights Act of 1964.[4]

---

[4] Appellant's argument in this area simply stresses the appellant's position that no state Human Relations Commission should be permitted to interfere with a federally-assisted housing development if the administration of that development conforms with the applicable federal law.

Reading the record with care, we find that CHA's blank pronouncement of adherence to HUD's Plan B is not substantiated by sworn testimony. HUD officers testified that they never thoroughly investigated the files of CHA to determine whether the plan was implemented.

In truth, the testimony demonstrates that any HUD investigation would be futile. CHA in only a few instances noted an applicant's rejection of available housing prior to ultimate acceptance of a location. This violates the HUD formulated plan which requires CHA to interpose at the bottom of the list of prospective tenants an applicant who refuses housing. Where no rejections were indicated, how can one determine whether the HUD plan had been followed?

Putting to rest the preemption argument, we say that the mere fact that CHA is federally assisted does not exempt it from the provisions of the State Human Relations Act which bars housing discrimination. An authority created by the State Legislature[5] and clothed with public trust must bear the closest scrutiny.[6]

Next, we look to the appellant's third contention, that the Commission's finding of fact and conclusions of law are not supported by substantial evidence.

The Administrative Agency Law, Act of June 4, 1945, P. L. 1388, as amended, 71 P.S. §1710 and the Pennsylvania Human Relations Act tell in reviewing an adjudication of the Pennsylvania Human Relations Commission that we must limit ourselves to a deter-

---

We dissect such a general statement into the one issue that appears relevant considering the context of this particular factual situation.

[5] Housing Authorities Law, Act of May 28, 1937, P. L. 955, as amended, 35 P.S. §1541 et seq.

[6] The Commonwealth and all political subdivisions and authorities are specifically subjected to the requirements of the Pennsylvania Human Relations Act. 43 P.S. §954(a).

mination of whether the agency acted in accordance with the law and whether findings of fact to support the conclusion are based on sufficient evidence. *Wilkinsburg School District, et al. v. Human Relations Commission, et al.,* 6 Pa. Commonwealth Ct. 378, 295 A. 2d 609 (1972).

We have painstakingly reviewed the testimony produced at the hearing stage. Generally, the evidence on which the Commission relies in support of its allegations of discrimination is spotty and indeed lacks fundamental background material. No thorough study of the duration and overall effect of the implementation of the tenant selection and placement procedures was ever made. What was established through sufficient evidence, however, was that certain tenants had been routed through CHA's tenant placement procedure into projects whose tenant majority (usually entirety) corresponded to the tenant's race.

The appellant concedes that blacks are always offered positions in black projects, and that whites never are. It points to a complicated system of priorities allegedly based on the HUD plan and the prevalent number of vacancies in the black project as the real cause of the continued scheme of segregation.

However, to us the most telling evidence came from the occupancy supervisor for CHA who could give no reason why a black woman with a priority need was caused to wait for an opening in a black project when, during that wait, the white project had a suitable vacancy.

We conclude that sufficient competent evidence was adduced to sustain the Commission's findings that *particular tenants,* both black and white, were refused housing due to racial considerations because CHA had failed to offer available space, regardless of location, to a top priority tenant when it should have done so, regardless of race consideration.

The Commission's ninth and tenth findings of fact must fall because there is insufficient evidence to substantiate these broad brush conclusions.[7] The record fails to reveal the duration of discriminatory practices or the probable effect on the racial composition of the housing projects as they now exist. Factors other than discriminatory selection and placement procedures may very well have been the reason for the present segregated housing composition of the Chester housing projects. Particular instances of tenant discrimination in 1970 and 1971 are just not enough to sustain the Commission's findings that the discriminatory selection procedures are the cause of the present racial composition in the Chester Schools and housing projects.

Finally, we turn to the order of the Commission and appellant's final contention that the order is unenforceable.

The appellant urges upon this Court the argument that implementation of certain parts of the Commission's order would necessarily cause unbounded vacancies in the housing projects. This is not what makes the Order unenforceable. The Order requires CHA to cease renting accommodations to white tenants until the racial composition in the white project reflects the total white to black ratio in all the projects under its control. The same requirement is extended to the black

[7] These findings provide:

"9. As a result of the aforesaid practices the racial compositions of Respondent's aforesaid public housing projects were and are segregated by the race of the tenants thereof.

"10. The maintaining of the aforesaid practices by Respondent has increased the racial segregation of the public schools of the City of Chester. Of 3,000 students in the four Chester Public Housing units, approximately 2700 to 2800 attend Chester Public Schools. If the aforesaid four Public Housing units were racially balanced, the Chester School District Plan for racially balancing its Public Schools would have been redesigned so as to reduce the need and cost of busing Chester School District students."

projects. In addition to or in furtherance of its objective, the Order sets up the means by which this desegregation is to be implemented.

The ninth and tenth findings of fact were stricken because of the lack of evidence to support these findings.

Likewise, the portion of the Commission's Order implementing a far-reaching desegregation plan in the Chester housing projects must be stricken for lack of evidence. Once again, it must be emphasized that a record barely substantiating particular acts of discrimination in tenant placement in the years 1970 and 1971 cannot be the springboard for a Commission order which attempts to rectify segregated housing projects when there is no evidence to support the conclusion that these discriminatory placement practices were the cause of the segregation.

These portions of the Commission's Order are not "unenforceable" as appellant contends, but rather are "unwarranted" because of the absence of evidence to support the Order.[8]

### Order

And Now, this 11th day of June, 1973, the Order of the Pennsylvania Human Relations Commission is hereby affirmed with the exception of enumerated paragraphs two, three, four, eight and ten which are stricken.

---

[8] §44 of the Administrative Agency Law gives the Court the power to set aside or modify the Commission's adjudication where the findings of fact necessary to support its adjudication are not supported by substantial evidence. *Pennsylvania Human Relations Commission v. Chester School District*, 427 Pa. 157, 233 A. 2d 290 (1967).