638 A.2d 304

**PENNSYLVANIA HUMAN RELATIONS COMMISSION, Petitioner,**

v.

**SCHOOL DISTRICT OF PHILADELPHIA, Respondent,**

**and**

**Harry and Annemarie Gwynne, Aspira of Pennsylvania, et al., Intervenors.**

Commonwealth Court of Pennsylvania.

Decided Feb. 4, 1994.

660

Elisabeth S. Shuster, Chief Counsel, and Michael Hardiman, Asst. Chief Counsel, for petitioner.

William H. Brown, III, and Christina Rainville, for respondent.

Michael Churchill, Richard Z. Freemann, Jr., and Daniel W. Cantu–Hertzler, for intervenors.

SMITH, Judge.

Before the Court is the latest chapter in litigation between the Pennsylvania Human Relations Commission (Commission) and the Philadelphia School District spanning almost twenty-three years during which the Commission has sought to compel the School District to comply with orders of the Commission and this Court to desegregate Philadelphia's public schools.

## I.

### Background

The Commission issued its initial adjudication on June 7, 1971 pursuant to Sections 1–13 of the Pennsylvania Human Relations Act, Act of October 27, 1955, P.L. 744, *as amended,* 43 P.S. §§ 951–963, in which the Commission determined that the Philadelphia School District was unlawfully segregated by race and ordered the School District to develop and submit to the Commission a plan to eliminate the racial imbalance in its schools over a three-year period. On appeal by the School District, this Court affirmed the Commission's order requiring the District to correct the de facto segregation within its schools but remanded the matter to the Commission for necessary modifications of its order as to staff recruitment and assignment. *Philadelphia School Dist. v. Pennsylvania Human Relations Commission (HRC I),* 6 Pa.Commonwealth Ct. 281, 294 A.2d 410 (1972), *aff'd,* 455 Pa. 52, 313 A.2d 156 (1973). Thereafter, the Commission issued an amended final order dated September 25, 1972 requiring the School District to submit a plan by January 1973 to eliminate racial imbalance in its schools in conformity with the Commission's recommended elements of a school desegregation plan. The School District

neither appealed the Court's order nor submitted the ordered plan, prompting enforcement proceedings by the Commission.

Pursuant to a November 14, 1973 order of this Court, the District submitted a plan in 1974 which the Commission rejected and subsequently filed a second enforcement petition. Another plan was submitted by the School District in 1975 although it argued that full compliance with this Court's directive was impossible because of the District's financial deficits and refusal of funding by the Commonwealth. That plan proposed to create a metropolitan school district among Philadelphia and ten adjacent school districts. The Court en banc in *Pennsylvania Human Relations Commission v. School Dist. of Philadelphia (HRC II)*, 23 Pa.Commonwealth Ct. 312, 352 A.2d 200 (1976), rejected the 1975 plan as it was beyond the District's power to implement, the Commission's power to order, and this Court's power to compel. The School District was thereupon ordered to submit a definitive plan and timetable for implementation to cure racial imbalance in the District's schools. The case was once again remanded to the Commission with jurisdiction retained by this Court.

In 1976, the School District submitted to the Commission a voluntary desegregation plan centered around a new magnet school program allowing students and their parents to select a school of their choice so long as the selection was consistent with desegregation. The Commission rejected the plan because it was entirely voluntary and returned to Commonwealth Court to enforce its amended final order and the Court's order in *HRC II*. This Court however denied the Commission's enforcement petition in July 1977 and directed the School District to implement its 1976 voluntary desegregation plan but authorized the Commission to return to court if dissatisfied with the School District's results. *See Pennsylvania Human Relations Commission v. School Dist. of Philadelphia (HRC III)*, 30 Pa.Commonwealth Ct. 644, 374 A.2d 1014 (1977), *aff'd*, 480 Pa. 398, 390 A.2d 1238 (1978).

In July 1980, the Commission again petitioned this Court to compel the School District to submit a desegregation plan which included mandatory measures because the District's

efforts under the 1976 plan were insufficient. In April 1982, this Court issued yet another opinion at *Pennsylvania Human Relations Commission v. School Dist. of Philadelphia (HRC IV)*, 66 Pa.Commonwealth Ct. 154, 443 A.2d 1343 (1982), in which the School District was ordered to modify its 1976 voluntary desegregation plan to achieve more comprehensive desegregation as measured by the Commission's 1979 definition of a segregated school. In October 1983, the School District submitted proposed modifications to its 1976 plan (1983 modified plan) which the Commission rejected because of its continued non-compliance with this Court's order.

Notwithstanding its rejection, the Commission agreed to execute a memorandum of understanding with the School District in which the Commission agreed to allow the School District a three-year period to implement its 1983 modified plan. Subsequent to its evaluation of the three-year implementation period, the Commission notified the School District in June 1988 that maximum feasible desegregation had not been achieved thereby invoking terms of the agreement and authorizing the appointment of a settlement team to independently evaluate the School District's progress toward desegregation. This settlement team, appointed by former President Judge Crumlish in July 1990, submitted a report in November 1992 in which the team found that a great majority of Philadelphia's public schools are segregated and concurred that the School District had not achieved maximum feasible desegregation.

Intervention in the current enforcement proceedings was granted on April 2, 1993 to representative parent groups and other interested parties.[1] After the initial phase of hearings in this matter, the Court entered an order on April 14, 1993

1. Intervenors Olney–Oaklane–Feltonville Parents for Better Schools, Lowell Home and School Association, Finletter Home and School Association (Lowell); Coalition of Concerned Citizens for Quality Education (Coalition of Concerned Citizens); and ASPIRA of Pennsylvania, Citizens Committee on Public Education in Philadelphia, Fellowship Commission, Parents Union for Public Schools, Philadelphia Association of School Administrators, and Philadelphia Home and School Council (ASPIRA).

granting in part the School District's motion for directed verdict, treated as a motion for compulsory nonsuit, and ordered that mandatory busing would not be imposed by the Court as a means to further desegregate the District's schools because the Commission failed to prove the feasibility of mandatory busing or that the School District's failure to achieve maximum feasible desegregation could be cured by such means. Nevertheless, trial would proceed as to whether the School District offered equal educational opportunities to its minority students and implemented all feasible measures to further desegregate the School District by voluntary means. The Commission and School District filed separate petitions for permission to appeal with the Pennsylvania Supreme Court which denied both petitions by order dated June 29, 1993. *Pennsylvania Human Relations Commission v. School Dist. of Philadelphia* (No. 1056 C.D.1973, filed June 4, 1993), *aff'd,* (Nos. 62, 63 Misc.Dkt. 1993, filed June 29, 1993).

## II.

### Preliminary Questions

#### (a)

The School District presented its motion for directed verdict to the Court at the close of the record on November 30, 1993 requesting that judgment be entered for the School District because neither the Commission nor Intervenors demonstrated that maximum feasible desegregation had not been achieved by the School District. A motion for directed verdict may be granted only where the record makes it clear that the moving party is entitled to relief. In deciding a motion for directed verdict, courts must consider the evidence in the light most favorable to the parties against whom the motion is made and must accept as true all evidence supporting those parties' contentions and must reject all adverse testimony. *Thompson v. Maryland & Pennsylvania R.R. Preservation Soc'y,* 417 Pa.Superior Ct. 216, 612 A.2d 450 (1992), *appeal denied,* 533 Pa. 635, 621 A.2d 581 (1993).

■ In support of its motion, the School District argues that no evidence was offered to prove that any additional schools could have been desegregated since 1983 as no evidence was presented of specific pairings which could have been accomplished without mandatory busing; no evidence was presented concerning a specific magnet school which could have been created; nor was any other evidence presented which demonstrates that other measures could have been undertaken by the School District to further desegregate its schools. The District again raised its lack of financial resources as a defense to this action and asserted that it is financially incapable of initiating any additional desegregation measures and for that reason this lengthy litigation should be ended by the Court once and for all.

Another claim maintained by the School District is that no evidence was presented to show a correlation between alleged disparities in educational achievement of the District's students and desegregation. Contending that the educational achievement of minority students is irrelevant to this case, the School District erroneously states that this Court did not require the School District to implement educational goals nor to eliminate any disparities in educational achievement. Hence, because the Commission and Intervenors failed to "tie in" achievement with desegregation, they have failed to sustain their burden of proving a relationship between educational achievement and desegregation or stated another way, that desegregated schools tend to have higher test scores than racially isolated minority schools or that poor achievement of minority students is in any way connected to the issue of desegregation.

The Court heard extensive testimony in this case, and it is quite evident from the voluminous record that the School District is not entitled to a directed verdict. The Commission has steadfastly maintained that the School District has failed to comply with the orders to desegregate its schools or to correspondingly satisfy the terms of its 1983 modified plan which was formulated to improve racial imbalance in the schools and to provide educational opportunities for minority

students. As will be developed later, the Court is of the opinion that the record supports in substantial part the positions advanced by the parties against whom the motion for directed verdict is made. Moreover, the Court categorically rejects the School District's assertion that disparities in educational achievement are irrelevant. To the contrary, disparities in educational achievement of students within the School District is one of the paramount and most fundamental issues presented in this case.

In *Sheff v. O'Neill,* 42 Conn.Supp. 172, 609 A.2d 1072 (1992), the question presented was whether the state's action or inaction with respect to providing a specific substantive level of education rose to a constitutional violation and was therefore a question inappropriate for summary judgment. The defendant school district's position that the constitution requires only legislation which makes education free and that the court may not inquire into the educational content of its students runs parallel to the position taken by the School District here. The court denied summary judgment relief and appropriately responded that constitutionally mandated educational opportunity was not limited to expenditures per pupil but was also a requirement for a specific substantive level of education. *See also Abbott v. Burke,* 119 N.J. 287, 575 A.2d 359 (1990) (the New Jersey Supreme Court observed that money is only one element in assessing the level of education in poor urban schools; that new approaches different from conventional instruction must be taken if these schools are to succeed; and that school funds can be used more effectively than being used today).

(b)

The School District has argued that the Commission has no authority under the Human Relations Act to require reassignment of school pupils on a race-based admissions policy and cite Section 1310 of the Public School Code of 1949, Act of March 10, 1949, P.L. 30, *as amended,* 24 P.S. § 13–1310(a), which makes it unlawful for schools to make distinctions on account of the race or color of any pupil attending a public school. Even under the voluntary desegregation plan, the

School District contends that the race-based admissions policy is unlawful as students will be denied admission to schools solely on account of their race.

█ Whether the law prohibits consideration of the race of students in making school assignments has been raised at various stages of this case by the School District. That question has been considered by courts and decided contrary to the arguments raised. Race-conscious decisions are not prohibited in school desegregation matters. The United States Supreme Court in *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986), held that the U.S. Constitution does not prohibit states from taking race into account in its educational decisions; and in *Regents of University of California v. Bakke*, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978), the justices concluded that to achieve diversity in school admissions, race is an appropriate consideration. *Morean v. Bd. of Educ. of Montclair*, 42 N.J. 237, 200 A.2d 97 (1964).

Moreover, this Court held in *Pennsylvania Human Relations Commission v. Bd. of Educ. of School Dist. of Pittsburgh*, 66 Pa.Commonwealth Ct. 219, 444 A.2d 792 (1982), that the requirement of a compulsory desegregation plan which mandatorily assigns students by race is not an unlawful or unconstitutional means to remedy de facto segregation; and in *School Dist. of Pittsburgh v. Rankin*, 39 Pa.Commonwealth Ct. 222, 396 A.2d 856 (1978), stated that the discretionary power of school boards regarding the assignment of students is limited only by orders of the Commission.

Commenting on a challenge to the Commission's jurisdiction, the Pennsylvania Supreme Court responded in *Pennsylvania Human Relations Commission v. Chester School Dist.*, 427 Pa. 157, 164, 233 A.2d 290, 294 (1967), that "[t]he school district does not suggest that it would be unconstitutional for the Legislature to command them to consider race in their districting proposals in order to achieve a semblance of racial balance in its schools, nor do we believe there would be any merit in such a contention." Correspondingly, in reviewing

the legislative history behind the Human Relations Act, the Court noted that "[h]ad the Legislature intended to reach by the 1961 amendments only de jure segregation, its legislative pronouncements would have been unnecessary. The 1954 *Brown* decision made it eminently clear that de jure segregation—racial isolation produced by the acts of public officials— is unconstitutional. A legislative pronouncement to this effect, and this effect only, would be mere gild on the lily." *Id.* at 169, 233 A.2d at 296.[2]

In *Kromnick v. School Dist. of Philadelphia,* 739 F.2d 894 (3d Cir.1984), *cert. denied,* 469 U.S. 1107, 105 S.Ct. 782, 83 L.Ed.2d 777 (1985), a case involving teacher assignments, the school district argued its right to assign teachers on the basis of race in an effort to promote a racially balanced teaching staff in the district's schools. The Court of Appeals ruled that race-conscious faculty reassignment was a commonly ordered remedy in litigation challenging de facto segregation. Had Congress, when it expanded Title VII of the Civil Rights Act of July 2, 1964, 42 U.S.C. § 2000e et seq., in 1972, intended to foreclose such a remedy, it would have so indicated; the legislative history of Title VII demonstrates concern for improving the education of students through diversified staff. Thus the court found that applying a per se analysis to voluntary staff integration decisions by the School District to further the education of students in de facto segregated schools would be inconsistent with the congressional intent underlying Title VII.

■■■■■ Because the Commission has the authority to order racially-based assignment of students to correct de facto seg-

2. De facto segregation has been defined in varying ways; however, the court in *Chester School Dist.,* and in *HRC IV,* reiterated an often used definition that the condition includes racial imbalance in schools which develops when the Black population becomes so great that drawing school zone boundaries geographically causes a great majority of Black children to attend schools overwhelmingly Black. De jure segregation has been defined as the unconstitutional segregation by the state, or school district, of school students on the basis of race or the maintenance of a dual school system. *Brown v. Bd. of Educ. of Topeka (Brown I),* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954). The court in *Chester School Dist.* also stated that a lack of funds is not a defense to maintaining a de facto segregated school system.

regation of schools within this Commonwealth, it therefore follows that the School District is not prohibited from considering race in the assignment of its students. It is well settled that the inherent inequities in segregated schools may not be corrected without consideration of race in connection with remedying the effects of unlawful segregation; and the School District's arguments to the contrary thus do not raise legally valid or recognizable claims and are consequently rejected.[3]

### (c)

■ The School District has contended that under the United States Constitution, a court may not order adjustments in the racial composition of a school district's schools unless de jure segregation has been found, citing *Swann v. Charlotte–Mecklenburg Bd. of Educ.*, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554, *reh'g denied,* 403 U.S. 912, 91 S.Ct. 2200, 29 L.Ed.2d 689 (1971), and that where de facto segregation exists, the school district has the discretion to desegregate its schools. Federal courts lack power to remedy de facto segregation as their authority extends only to cases of de jure segregation, *Freeman v. Pitts,* —— U.S. ——, 112 S.Ct. 1430, 118 L.Ed.2d 108 (1992); *Bd. of Educ. of Oklahoma City Public Schools v. Dowell,* 498 U.S. 237, 111 S.Ct. 630, 112 L.Ed.2d 715 (1991). State courts are not however precluded from remedying de facto segregation under state law. *See also Milliken v. Bradley,* 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974).

■ In *Chester School Dist.,* the court imposed upon school districts an obligation to provide equal educational opportunity to all students, and where necessary, the duty to initiate remedial programs to overcome the effects of discrimi-

---

**3.** The Commission has contended in its brief that Intervenor Coalition for Concerned Citizen's petition for relief challenging race-conscious assignments should be denied as it is beyond the scope of the Coalition's petition for intervention and for which intervention status was granted. While the Commission's contention raises some merit, the Court permitted the petition for relief as it contained a challenge which mirrored claims asserted by the School District and may arguably be subsumed in the petition for intervention. Nonetheless, this question is moot in view of the Court's suppression of Intervenor's untimely filed brief and the rulings in this matter.

nation as equally as the court obligated those school districts to take corrective action to reduce racial imbalances, even though the discrimination or racial segregation was not caused by deliberate action of the school district. Further, it was emphasized in *HRC I* that the desegregation case before the Court turned on the authority of the Commission under the Human Relations Act only and did not raise a constitutional challenge. Moreover, an order by the Commission to integrate schools to foster the public policy of this Commonwealth to provide an equal educational opportunity is not beyond the Commission's authority or power. Section 2(b) of the Human Relations Act, 43 P.S. § 952(b); *Uniontown Area School Dist. v. Pennsylvania Human Relations Commission,* 455 Pa. 52, 313 A.2d 156 (1973). *Accord Bd. of Educ. of Englewood Cliffs v. Bd. of Educ. of Englewood,* 257 N.J.Super. 413, 608 A.2d 914 (1992), *aff'd,* 132 N.J. 327, 625 A.2d 483, *cert. denied,* —— U.S. ——, 114 S.Ct. 547, 126 L.Ed.2d 449 (1993) (noting that nothing in *Milliken* or *Freeman* suggests that a state court is precluded from correcting de facto segregation to carry out state policy).

### (d)

In an April 14, 1993 order, the Court eliminated mandatory busing as a means to further desegregate the schools; and in the June 4, 1993 memorandum opinion filed in support of the order, the Court held that the Commission did not prove the feasibility of mandatory reassignment of students via busing nor the "cause and effect" relationship between busing and increased desegregation. Thus the School District's motion for directed verdict was granted in part only. Where a matter has been previously ruled upon by a judge in the same case, the judge may treat the earlier decision as the law of the case and should hesitate to change his or her ruling if the judge believes that it was correctly decided in the absence of some new or compelling circumstances. *See Sanchez v. Philadelphia Housing Auth.,* 148 Pa.Commonwealth Ct. 329, 611 A.2d 346 (1992); *Sheff.*

 The Commission continues to disagree with the correctness of the Court's decision and maintains its valid position that physical segregation must be eliminated within the schools and that elimination of racial imbalances is a critical first step in achieving an integrated society. However, since a thorough and exhaustive review of the record and consideration of the various arguments presented by the parties have revealed no new or overriding circumstances which mandate changing the Court's earlier ruling, it will therefore remain the law of this case.

## III.

### The Parties

The Commission has argued throughout this litigation that the purpose of the Human Relations Act is to promote an equal educational opportunity for all of the students attending the public schools within this Commonwealth and that this opportunity is enforceable by the Commission and courts of this Commonwealth. *See* Sections 2(b), 3 of the Human Relations Act, 43 P.S. §§ 952(b), 953; *Uniontown Area School Dist.* Moreover, in the landmark decision in desegregation law in Pennsylvania, *Chester School Dist.,* the Supreme Court stated that:

[T]he Legislature has specifically mandated in § 12 that 'the provisions of this act shall be construed liberally for the accomplishment of the purposes thereof.' In our view a more reasonable construction of the disputed phrase would be that where, as here, the responsible party has the power to take corrective measures, indeed of necessity it must redistrict periodically, its failure to act amounts to the continued withholding from most [Black] children the admitted advantages of an integrated education. Total nonaction by school boards is thus impossible and even seemingly neutral decisions frequently encourage de facto towards segregation. Such a construction, of course, does not mean that a totally integrated school system must be achieved overnight or that Chester need abandon neighborhood

schools but only that complete inaction under the circumstances of this case amounts to a denial of these advantages.

*Id.*, 427 Pa. at 165–66, 233 A.2d at 294–95.

The court also noted in *Chester School Dist.* that seemingly neutral decisions by school boards can and in fact did in certain circumstances lead to de facto segregation—decisions such as where to build new school facilities, the size of schools, attendance boundaries or areas from which students are drawn, and methods used to relieve overcrowding in its schools. There is no dispute that the Commission bases its complaint on de facto segregation in the Philadelphia schools, and even though no claim for de jure segregation was initiated, the School District nonetheless has a legal responsibility and duty to take steps to correct the condition, and its failure to do so constitutes a violation of the Human Relations Act.

Despite the Commission's continued concern for further integration of the School District's schools through mandatory measures, the Commission also recognizes that disparate educational opportunities must also be addressed, and emphasizes that an important element of any school desegregation case is to ensure that a desegregation plan matches services with the educational needs of each school building. Mr. Richard B. Anliot, who heads the Commission's desegregation unit, testified during the initial phase of this proceeding that in developing the Commission's recommended elements of a school desegregation plan, he included this element to guarantee a more equitable outcome in terms of student achievement.

\*

Intervenor ASPIRA has challenged the School District's performance under the 1983 modified plan and argued that the District has failed to provide an equal and adequate education in the racially isolated minority schools, and that this failure is demonstrated by the provision of fewer resources including, among other things, less experienced and less highly rated teachers, older school facilities requiring greater repair, fewer dollars spent on educational improvement in these schools, and limited opportunities for minority students to attend magnet

schools. Noting that educators agree that the disparities in achievement between Minority and White students can be corrected, and because the District has refused to go after additional funding for this purpose, ASPIRA contends that the District has not taken all feasible measures to remedy the segregated and disparate educational opportunities within its public schools.

Analyzing the voluminous factual record, Intervenor–ASPIRA argues that racial disparities in educational opportunities are evident in every indicator used to measure the quality of the School District's schools, including inter alia, standardized tests, teacher subject-matter letter grades, and graduation rates. Other evidence of disparity concerned the allocation of financial resources within the School District, and an examination of its budgets over a ten-year period establishes that a significantly higher percentage of funds were used for magnet and other support programs in non-racially isolated schools and no evidence was offered to show additional allocation or reallocation of funds or other resources for educational improvement opportunities in the racially isolated schools.

Intervenor ASPIRA also argues that evidence revealed that the School District's efforts at voluntary desegregation have not achieved the goals proposed in its 1983 modified plan. Reviewing the requests for transfers, ASPIRA maintains that a significant percentage of school transfer denials are to minority students and that the School District's goal in the modified plan was to increase voluntary transfers to at least 14,000 per year which was not achieved. If the voluntary desegregation effort were ended as the School District urges, there would be an increase in the already largely segregated status which currently exists within the School District.

*

Intervenor Lowell argues that the School District has not achieved maximum feasible desegregation because it has not expanded the number of schools in integrated neighborhoods where there is overcrowding, but has instead bused students from integrated neighborhoods in violation of the 1983 modi-

fied plan. Lowell argues that although the modified plan provides that students in naturally desegregated schools should not be reassigned and the Commission recommended constructing new schools as a tool for desegregation, the School District continues to bus students from integrated neighborhood schools due to overcrowding.

Further, overcrowded schools do not have available space for voluntary transfers which would further desegregate schools, and busing to relieve overcrowding is not a cost effective solution to the problem. Lowell also argues that the cost of voluntary busing under the desegregation program and mandatory busing to relieve school overcrowding degrades the educational programs for all students because the money allocated for busing cannot be spent on school construction, building maintenance or instructional programs. As to a remedy, the Court should focus on encouraging the School District to build schools where they are needed in racially integrated neighborhoods.

\*

The School District, in its reply to the briefs filed by the Commission and Intervenors ASPIRA and Lowell, maintains that the relevant time period for the Court's inquiry into the District's desegregation efforts is from 1983 through 1987 and that the evidence presented demonstrates that the District has done all that could be done to accomplish the goals of the 1983 modified plan.[4] Noting the extensive statistical data in the

4. The School District raised a continuing objection at trial to the introduction of evidence related to any period beyond 1987 because the implementation period for the 1983 modified plan lasted for the three-year period only, and it is therefore the relevant period during which the District's actions may be evaluated. The District's objections were overruled by the Court because of the impossibility of assessing and evaluating the District's compliance with terms of the 1983 modified plan without reviewing its actions to the present time and moreover, the District has offered no legal authority for its objections. In *Brown v. Bd. of Educ. of Topeka (Brown II)*, 978 F.2d 585 (10th Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 2994, 125 L.Ed.2d 688 (1993), the court accepted the view that the district court cannot evaluate a school district's compliance efforts without examining the school district's good faith commitment to the "whole" of the court's desegregation decree, and following the dictates of *Freeman*, current conditions must

record, the District contends that its definition of a desegregated school created considerably more schools in compliance with the modified plan than was indicated by the Commission, and that any further mandatory desegregation measures would be counter-productive.

Moreover, the School District believes that it performed a substantial portion of the educational components of the 1983 modified plan including, inter alia, selection of program modules best suited for each school; adoption of modules for the Priority One schools; a needs assessment survey for the replicating success schools; maintenance of the replicating success program ultimately converted into the school-wide project; and program upgrades. As to its financial resources, the School District has maintained throughout this litigation that it has no additional funds to allocate to any other programs for desegregation purposes; and it has not sought additional funding from the City because it would be a futile act. The District also claims that restrictions are imposed upon it in the assignment of teaching staff because union contract provisions prohibit the placement of better qualified teachers where needed the most, and that dealing with societal conditions including, among others, homelessness, lack of medical care, drug abuse, violence and teen pregnancies hamper the funding of programs designed to improve the achievement levels of students in racially isolated minority schools.

## IV.

### Elements of the Plan

The School District designed the 1983 modified plan with three initiatives: the Educational Improvement Plan; the Desegregation Expansion Strategy; and the Effort to Reduce Racial Isolation. The first of these initiatives contained four

be viewed to determine if a school district has discharged its duty across time. *See also Green v. County School Bd. of New Kent County*, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968) (desegregation plan adopted by the school district requires evaluation in practice). Recognition of the requirement for evaluation of the School District's actions to the present time is further illustrated by the District's assertions that it continues to implement the modified plan and that it is currently in effect. School District's Brief, p. 9.

stated goals which were to assure equal educational opportunity and equal access to excellence for all students within the School District regardless of the school attended; to provide educational offerings and specialized programs intended to attract a diverse student applicant pool; to reorganize educational offerings and effect a measurable improvement in student performance at the designated Priority One educational improvement schools; and to respond to the unique educational concerns of those students attending racially isolated schools. The School District recognized that to achieve excellence within the schools, there was a need for each school to have clearly defined learning goals and guidelines for instruction and that high achievement expectations must prevail with emphasis on accepting responsibility for learning by staff and students.

The Desegregation Expansion Strategy encompassed components which were to continue policies to assure a racially balanced instructional staff at each school; identify and target schools to be moved toward desegregated status; establish a unit to provide technical assistance to schools and support to parents and students; implement enhanced sensitivity staff development training so that staff can effectively respond to needs of a diverse student population; and expand efforts to improve intergroup relations. The School District established two types of transfers as a means to encourage and provide incentive for voluntary student transfers: EH–36 transfers are available for students wishing to transfer between neighborhood schools and any other open enrollment school; and EH–38 transfers are available for those students seeking transfer to special admissions schools or programs. Free transportation is provided by direct bus service or bus tokens.

The Effort to Reduce Racial Isolation component focuses on racially isolated schools in which the student population is more than 90 percent Black, White, Hispanic or Asian. The School District's effort encompassed augmented curriculum offerings on multicultural understanding; reorganization and refocusing of shared-time activities; career development laboratory concept; and region-wide efforts to develop a program

for all children to meet and to interact. In racially isolated schools, the curriculum would be augmented by emphasizing units of content within the social studies curriculum.

The plan provides that while desegregation is the goal, integration is the objective, and that desegregation should be achieved so as to enhance the likelihood that integration will occur. The plan further sets forth the following guidelines:

Because integration is the long-term objective, schools and programs that are already stably desegregated should be left substantially intact.

Because integration is the long-term objective, schools and programs that are marginally or recently desegregated should be monitored, strengthened and left substantially intact.

Because integration is the long-term objective, patterns, trends and programs that have real likelihood of leading naturally to desegregation should remain undisturbed.

Commission Ex. 2, p. 57.

### V.

### Findings

1. The Philadelphia School District's enrollment as of September 1992 was 201,400 students who attended approximately 250 schools within the District. The racial composition of the student population as of fall 1992 was 126,492 or 62.8 percent Black; 20,669 or 10 percent Hispanic; 9,314 or 4.6 percent Asian; and 44,963 or 22.3 percent White.[5] For desegregation purposes, the School District's schools are identified as racially isolated (more than 90 percent minority or 90

---

5. In 1992, there were 46,609 White students attending parochial schools; in 1980, 68,904 White students attended parochial schools and 64,500 attended public schools; and in 1970, 88,542 White students attended parochial schools and 101,784 attended public schools. When the 1983 modified plan was implemented, White students represented 25.8 percent of the population and by 1987, they represented 23.8 percent of student enrollment.

Public school enrollment at varying times was as follows: 1970—279,847; 1980—224,339; 1990—190,978; 1992—201,496; and 1993—207,000.

percent white); desegregated (25 to 60 percent white or 40 to 75 percent minority); and remainder schools (75 to 90 percent minority or 60 to 90 percent white).

2. As of 1992, there were 134 racially isolated minority schools comprising 107,327 students or 53 percent of the student population; two racially isolated white schools with 1,035 students or .05 percent of the student population; fifty-seven desegregated schools with 38,566 students or 19 percent of the student population; and forty-five remainder schools with 54,072 students or 27 percent of the student population. In racially isolated minority schools, over 90 percent of the student population is minority. As of December 1, 1992, School District data show that 73.26 percent of the District's Black students were attending schools with over 90 percent minority population. In November, 1977, there were 113 such schools and 111 in 1980. *HRC IV.*

3. School District estimates are that 76 percent of its students live below the poverty line and that the level of poverty in the racially isolated minority schools goes as high as 95–96 percent. The School District uses AFDC (Aid for Families With Dependent Children) eligibility as its measure of poverty.

4. The School District is divided into seven administrative areas. Most of the White students are concentrated in what had been referred to as districts seven and eight (northeast), and 57 percent of White students attend schools in these districts. Over 98 percent of the students attending the 134 racially isolated schools are minority, and 73 percent of all Black students attend racially isolated schools with an enrollment of over 90 percent minority.

5. The School District's city-wide achievement test data report the number and percentage of student test results by national percentile rank band on the CTB Macmillan/McGraw–Hill test organized by the students' race and ethnicity. The percentile ranks reported annually were: below the 16th percentile or lowest achievement level, 16th to 49th percentile, at/above 50th percentile, and above 84th per-

centile or highest achievement level. In 1992, the School District switched to the Comprehensive Test of Basic Skills–4 and changed the reporting of its city-wide achievement test data from percentiles to 1st or lowest quartile, 2nd quartile, 3rd quartile and 4th or highest quartile.

6. The School District's Priority One initiative expanded the educational improvement replicating success project implemented in 1983 as part of the School District's 1983 modified plan. This initiative focused on low achieving elementary schools and sought improvement in the percentage of students scoring at or above the 50th percentile in the four major subjects on the spring city-wide testing; reduction in the proportion of students scoring below the 16th percentile in the four major subjects; increase in the percentage of students receiving report card grades of A or B in reading, writing, math, science and social studies; and by 1991 students in those schools were to show mastery of writing goals of the standardized curriculum so that 75 percent will attain a mark of A, B or C in the final report card.

7. The Priority One goals are based on the assumptions that grade level performance is indicated by mastery of 75 percent of the objectives on the city-wide testing program; a student's score of 75 percent will customarily score at or above the 50th percentile in terms of national norms; and a letter grade of A, B or C indicates that a student is performing at or above grade level.

8. City-wide 1990 results for students tested in reading from grades 1 through 8 showed that 7 percent of the White students scored below the 16th percentile compared to 15 percent for Black students; and 19 percent of the White students scored above the 84th percentile compared to 7 percent for Black students. In math, 7 percent of the White students tested below the 16th percentile compared to 15 percent for Black students; and 31 percent scored above the 84th percentile compared to 13 percent for Black students.

9. City-wide 1990 test results in reading/English/language arts show that the gap between White and Black students in

grades 1 through 8 who scored above the 50th percentile was 22 percent and by 1992 had expanded to 24 percent; the gap between White and Hispanic students was 31 percent in 1990 and 30 percent in 1992. Test results in math concepts and applications show a 23 percent gap between White and Black students in 1990 which expanded to 29 percent in 1992.

10. In 1990, 58 percent of the White students tested from grades 1 through 8 in reading/English/language arts scored above the 50th percentile compared to 36 percent for Blacks and 27 percent for Hispanics or gaps of 22 and 31 percent respectively. In 1991, 50 percent of the Whites scored above the 50th percentile compared to 37 percent for Blacks and 28 percent for Hispanics or gaps of 13 and 22 percent respectively. In 1992, 47 percent of White students scored above the 50th percentile compared to 23 percent for Blacks and 17 percent for Hispanics or gaps of 24 and 30 percent respectively. In math concepts, the yearly percentages are higher for students scoring above the 50th percentile but the gaps between students by race widened.

11. City-wide 1990 results for students tested in grades 8 through 12 in reading/English show that 7 percent of the White students scored below the 16th national percentile compared to 19 percent for Black students; and 28 percent scored above the 84th national percentile compared to 12 percent for Black students.

12. For the period 1988 to 1991, city-wide test results for students in racially isolated and desegregated schools tested in reading showed 32 percent of students in racially isolated schools scored above the 50th percentile compared to 52 percent for desegregated schools, and for each year through 1991, the gap averaged 20 percentage points between students above the 50th percentile. In math, the city-wide test results showed an 18 percent gap between students in racially isolated and desegregated schools scoring above the 50th percentile and that gap increased to 22 percent by 1991.

13. City-wide 1992 test results for racially isolated schools show that in reading 4 percent of the students scored in the

highest quartile and 55 percent scored in the lowest quartile; in math, 6 percent of these students scored in the highest quartile and 54 percent in the lowest quartile. For desegregated schools, 15 percent of the students tested in reading scored in the highest quartile and 35 percent scored in the lowest quartile; in math, 19 percent scored in the highest quartile and 33 percent in the lowest quartile.

14. City-wide 1992 test data shows that 17 percent of students in the 134 racially isolated schools scored above the national median in reading compared to 36 percent for students in desegregated schools. In math, 19 percent of the racially isolated schools scored above the 50th percentile compared to 40 percent for the desegregated schools.

15. The TELLS test, an examination of public school students for minimum competency in reading and math, was developed at the direction of the governor of Pennsylvania, and was given to third, fifth and eighth graders from 1984 through the 1991. The Department of Education issued reports showing the percent of students who reached cut scores, or the state-established minimum level of acceptable performance in basic reading and math skills. The TELLS reading test results for the 1990–91 school year show that 55 percent of the Black students and 63 percent of the Hispanic students tested scored below the cut score, compared to 29 percent for White students. In math, 50 percent of the Black students and 58.2 percent of the Hispanic students tested scored below the cut score compared to 26.5 percent for the White students.

16. Significant disparities exist between students on letter-grade marks by subject and race. The 1990 baseline data for performance indicators show that in English, 22.5 percent of the White students in grade 12 received A's compared to 10.5 percent for Black students and 15.8 percent for Hispanic students; and 10.7 percent Black and 11.2 percent Hispanic students received F's contrasted with 5.3 percent for Whites. In social studies, 21.7 percent of the White students received A's compared to 10.5 percent for Black and 13.3 percent for Hispanic students; and 10.2 percent Black and 12 percent Hispanic students received F's compared to 5.2 percent for

Whites. The percentage of students receiving A's in math were 22.7 percent for Whites, 11.5 percent for Blacks and 14.7 percent for Hispanics; and 14.4 percent Blacks and 13.3 percent Hispanics received F's compared to 8.2 percent for Whites. In science, 18.5 percent White students received A's compared to 7.7 percent for Black and 12.2 percent for Hispanic students; and 11.2 percent Black and 12.2 percent Hispanics received F's compared to 6.5 percent for Whites.

17. Analysis of the School District's city-wide summaries for elementary/middle school letter-grades show the same disturbing pattern. Data for students tested in grades 1 through 8 in language arts show that 22.9 percent of the White students received A's compared to 10.8 percent for Blacks and 7.9 percent for Hispanic students, and at the bottom end, 11.6 percent Black and 15.3 percent Hispanic students received F's compared to 6.5 percent for Whites. In reading, 32.7 percent of the White students received A's compared to 18.4 percent for Black and 14.9 percent for Hispanic students; and 5.9 percent Black and 7.9 percent Hispanic students received F's compared to 3.8 percent for Whites. This pattern persists for elementary/middle school letter-grade data pertaining to English, math, social studies and science.

18. Data for advanced placement course opportunities from 1988 to 1992 show a substantial disparity: in 1988–89, 4.8 percent of the White students were in advanced placement compared to .6 percent for Blacks and .8 percent for Hispanics; and in 1991–92, 5.4 percent of the White students were in advanced placement compared to 1.4 percent for Blacks and .7 percent for Hispanics. As of June 1990, 4300 more Whites participated in the mentally gifted program than Blacks.

19. Graduation rates further demonstrate achievement disparities: for 1991–92, 84 percent of the White seniors received their diplomas, and 73 percent of the Black seniors and 68 percent of the Hispanic seniors received their diplomas. The gap in graduation rates between Black and White students ranged from 10 percent in 1986–87 school year to 13 percent in 1988–89 and 11 percent in 1991–92; and for White and

Hispanic students, the gap ranged from 15 percent in 1986–87, 18 percent in 1988–89 and 16 percent in 1991–92.

20. Expert testimony proved that although poverty is the most significant variable in explaining achievement disparities, racial isolation of students has a statistically significant and independent effect on achievement outcomes. In 1990, the School District adopted a goal to reduce by ten percent over the next five years the achievement gaps between Black, Hispanic and White students and to increase during the same period, the number of Black and Hispanic students enrolled in advanced placement courses. The five-year goal was developed to comply with the educational improvement component of the 1983 modified plan.

21. Voluntary school transfer records show that approximately 18 percent of the 284,000 transfer requests submitted by Black students from 1985–93 were approved, and 33 percent of 66,200 transfer requests from White students were approved. From 1985–93, 10 percent of the EH–36 transfer requests were from White students and 82 percent of these requests were from Black students. White students' EH–36 transfer requests have gone from a high of 1,229 in 1987–88 to a low of 459 in 1992–93. The School District receives larger numbers of White student transfer requests for EH–38 special admissions.

22. The desegregation office maintained an informal policy of reserving 50 percent of all spaces in the School District's magnet program for White students although they comprise 22 percent of the student population, thereby reducing the number of Black and Hispanic students eligible for admission to those enriched learning programs which maintain lower student-teacher ratios, better-qualified teachers and enhanced resources.

23. The office of desegregation targeted 118 schools in 1983 for desegregation; the first group selected were those already desegregated, according to the School District, and the remaining fifty schools were targeted for desegregation. As of 1992–93, not more than twenty-five of those schools have

been desegregated. The Commission's records show that under its definition of a non-segregated school, the number of desegregated schools increased by two, from thirty-eight to forty during the three-year implementation period of the 1983 modified plan; and by 1991, the number of desegregated schools had been reduced to thirty-five. The Commission's definition of a non-segregated school is one with at least 25 percent White enrollment and at least 40 percent Black enrollment, or at least 20 percent Hispanic enrollment and at least 25 percent White and 25 percent Black enrollment.

24. A study of census tract records presented by a School District expert shows that the City of Philadelphia is residentially segregated by race and is more segregated today than ever before, and census maps show a strong correlation between racial composition of neighborhoods and the racial composition of schools which are more segregated today than they were in 1984 or 1985. Elementary school segregation is even higher for Hispanics because these schools are confined to Hispanic neighborhoods.

25. Race is only considered by the School District in transfer requests to the 118 schools targeted for desegregation under the 1983 modified plan. Only one-half of the thirty magnet school programs are either desegregated or targeted for desegregation; and race is not considered for the remainder of schools where students request to transfer out of their neighborhood schools.

26. The 1983 modified plan excluded from the desegregation expansion component the seventy-six Priority One schools, which later incorporated the School-wide project effort, and these excluded schools were predominantly racially isolated minority schools. School-wide projects are those schools in which 75 percent or more of the students come from families living below the poverty line, and they receive federal Chapter One funds for the purpose of improving overall school programs and to help students succeed on a daily basis in school.

27. The Priority One work plan for school improvement was developed in response to teachers' low expectations of poor students, and staff development and training was required for the Priority One program to alter teacher expectations as to poor minority students. School District staff estimated that one-third of the teachers who volunteered for the Priority One training held low expectations of poor minority children.

28. The least experienced teachers are employed in racially isolated minority schools which face the highest rate of teacher turnover; the best qualified of the newly hired teachers work in white or desegregated schools rather than serve in racially isolated minority schools and the most experienced teachers generally work in the northwest or northeast areas. The racially isolated minority schools also experience fewer substitutes and the highest percentage of non-certified substitutes. High teacher turnover in racially isolated minority schools has existed within the School District for many years yet no system-wide mandates are in place to correct this condition.

29. The School District reported that certain of the School-wide projects have received national attention because of the success with particular programs: William Dick Elementary School created an eleven-month program and used extra time to ensure higher percentages of students mastering the curriculum and qualifying for promotion to the next grade; the Lingelbach School emphasized higher skills and integration of communication skills and the arts; the Key School implemented the "success for all" model whereby students in the early grades are given individualized tutoring daily where necessary to produce success.

30. Students in racially isolated minority schools are required to attend the older and most physically deteriorated school facilities within the School District which require the greatest amount of maintenance and repair; some of the racially isolated minority schools also present security and safety problems which have not been ameliorated by the District and which hinder learning.

31. Due to budget cuts for the current year, the School District eliminated two full-day kindergarten programs from desegregated schools and seven full-day kindergarten programs from racially isolated minority schools where the need was greatest. In the 1992–93 school year, the School District maintained full-day kindergarten classes in thirty-two of the fifty-seven desegregated schools and fifty-three in the racially isolated minority schools. Twenty percent of the first graders in the School District received no kindergarten or pre-school experience.

32. The School District's operating budget for the 1992–93 school year was $1.3 billion in round figures, and of this amount a substantially low sum was allocated and spent on desegregation programs. The sum expended for the Priority One educational improvement program in racially isolated minority schools was $2,316,622 or an infinitesimal sum compared to the total annual operating budget. The District has made no attempt to secure additional funding from the City of Philadelphia or Commonwealth of Pennsylvania for its educational improvement initiatives in low achievement racially isolated minority schools, nor has it reallocated surplus funds to expand upon the academic initiatives in these schools.

33. The School District's desegregation cost was $33,710,-800 for 1991–92 and included $3,264,008 for Priority One programs, or less than one percent of the total desegregation budget; and $2,316,622 for 1992–93, or two-thirds of one percent of the total desegregation budget of $34,606,208. During the same two-year period, $10,662,861 was spent on magnet school programs with an enrollment of 2,004 students.

34. The School District's analysis of costs per pupil show that for the 1992–93 school year, $5,783 was spent per pupil and this sum is expected to decline to $5,317 for the current year.

35. Pupil cost analyses further show that for the four-year period from 1989–90 through 1992–93, the total expenditures for non-public school students ranged from $38,247,370 to $36,546,663. For 1993–94, the School District's adopted budget for non-public school students is $38,149,967 which in-

cludes $18 million for transportation of students to private and parochial schools.

36. Expenditures for the replicating success component of the Educational Improvement Plan ranged from a sum of $179,134 in 1983–84 to $818,715 in 1985–86. The replicating success project involved 26 of the successor Priority One racially isolated minority schools in a three-year effort to improve the educational potential of these schools by upgrading programs through replication and incorporation of instruction proven successful in similar situations.

37. The three most overcrowded schools in the northeast and central east region are Morrison, Olney and Lowell; Lowell and Olney were considered by the School District to be desegregated and Morrison was considered to be a multicultural school. Children from these schools are bused outside of their integrated neighborhoods to other locations to reduce overcrowding. The School District has maintained overcrowded schools in integrated neighborhoods for more than a decade and has failed in prior years to consider new construction in these neighborhoods to promote the desegregation goals.

38. In its 1988–92 contract with the Philadelphia Federation of Teachers, the School District retained the authority to appoint experienced teachers to facilities with experience imbalance, to involuntarily transfer teachers in the first year of service to reduce racial or experience imbalance, and to prevent more than 10 percent of appointed teachers in a school from transferring therefrom in any year for any reason. The School District contracted away this authority in its 1992–94 teachers' contract.

39. In 1992–93, the School District employed 12,500 teachers.

## VI.

### Discussion

### (a)

■ Starting with the basic assumptions outlined in the School District's 1983 modified plan that "[a]ll students can

learn regardless of race, ethnic background, or socio-economic level[;] [a]ll students have a right to expect the same level of curricular content and quality of instruction regardless of school location [and] [a]ll students need to know, understand, and apply the values of a multicultural, democratic society," the Court must and shall look to student achievement results, among other things, to determine whether an equal educational opportunity has been made available to all students within the public schools. School District 1983 Modified Plan, Educational Improvement Component, p. 23.

In *Freeman*, —— U.S. at ——, 112 S.Ct. at 1437, the Supreme Court stated that a "[p]roper resolution of any desegregation case turns on the careful assessment of its facts," and as to the School District's contention that educational opportunity and equality of education is irrelevant to this proceeding, the Court first directs the District to the express requirements of the Educational Improvement Component of its 1983 modified plan and as well, to the plethora of federal and state court decisions which recognize that assessment of the equality of educational opportunity and quality of education is an appropriate inquiry by the Court in determining whether racial disparity exists in the public school system under court decree.[6]

In *Brown v. Bd. of Educ. of Topeka (Brown I)*, 347 U.S. 483, 493, 74 S.Ct. 686, 691, 98 L.Ed. 873 (1954), the leading case which established a foundation for the dismantling of barriers

---

**6.** *See e.g. Freeman* (approved district court's consideration of differences in equality of education as measured by achievements of minority students); *Swann* (equity jurisdiction confers power to do equity and to fashion decree deemed necessary under facts of the case); *United States v. City of Yonkers*, 833 F.Supp. 214 (S.D.N.Y.1993) (factors relied upon in finding discrimination against Black and Hispanic students included disparity between majority and minority students in achievement levels); *HRC II* (School District desegregation plan must include educational content as well as plans for eliminating racial imbalances); *Sheff* (educational opportunity is not limited to expenditure per pupil but also requires specific substantive level of education); *Bd. of Educ. of Englewood Cliffs* (reiterated state's long-standing philosophy that sound educational and legal principles do not permit segregation with its inherent inequality in educational opportunities); and *Abbott* (court considered sufficiency of education to enable Black and Hispanic students to assume proper roles in society).

erected throughout this nation to equal educational access and opportunity, the U.S. Supreme Court cogently admonished that:

> Today, education is perhaps the most important function of state and local governments. Compulsory school attendance laws and the great expenditures for education both demonstrate our recognition of the importance of education to our democratic society. It is required in the performance of our most basic public responsibilities, even service in the armed forces. It is the very foundation of good citizenship. Today it is a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment. In these days, it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education. Such an opportunity, where the state has undertaken to provide it, *is a right which must be made available to all on equal terms.* (Emphasis added.)

Despite the fact that the question presented in *Brown I* concerned the school district's maintenance of a dual school system based solely on race, the court's statements are no less compelling or persuasive where as here the question involves the effects of de facto segregation and whether equal educational opportunity in terms of a quality education is provided to minority students attending public schools.

The evidence adduced at trial unequivocally supports the contention of Intervenor ASPIRA and the Commission that Black and Hispanic students lag behind White students in reading and math as measured by test results and in all other indicators utilized to assess academic achievement and that to a statistically significant degree, race is a factor with regard to the levels of academic achievement even correlating for other variables such as poverty, busing, school attendance rates or teacher/student turnover. Thus the parties have sustained their burden of showing that race is a significant factor in the achievement gaps which continue to widen between the stu-

dents.[7] Intervenor Lowell presented evidence which sufficiently established that integrated schools in the central east and northeast regions of the School District are overcrowded and that the School District buses students from those schools despite provisions in the 1983 modified plan which require it to leave the population of integrated schools undisturbed, and to subordinate pupil movement strategies and maintain "educationally defensible programs" designed to respond to the needs and concerns of the integrated neighborhoods.

Although some of the socio-economic conditions relied upon by the School District as a defense to its failure, or refusal, to provide equal educational opportunity and quality education for all students within the system may in fact produce negative impacts upon some students' willingness or motivation to succeed in the classroom, the stark showing in this record of the disparities in educational achievement and opportunity represents substantial and sufficient evidence to satisfy the Commission and Intervenors' burden of proof.

(b)

A summary of the extensive testimony offered by witnesses for the parties is presented hereafter.[8]

7. The Commission and Intervenor ASPIRA have argued that the burden of proof in this matter is on the School District to prove its compliance with the court's order. The Court however ruled previously that the Commission and Intervenors had the burden in this enforcement proceeding to demonstrate that the School District has failed to further desegregate its schools in accordance with the 1983 Modified Plan because the Commission agreed to implementation of the plan, to evaluate the District's progress under the plan, and to thereafter determine whether to proceed with enforcement of this Court's April 15, 1982 desegregation order.

 Placing the burden on the Commission and Intervenors in this action by no means implies that the Commission or the Intervenors must produce evidence of an alternative plan or other specific measures which the School District should have assumed to cure its de facto segregative school system. *Chester School Dist.*

8. The expert witnesses who testified for Intervenor ASPIRA were Dr. J. Jerome Harris, educator and former Superintendent for the Atlanta school district, qualified as expert in school improvement and increasing achievement in poor and minority schools, N.T. pp. 2758–2883, 3243–3426; and Dr. Janice Fanning Madden, economist and Viceprovost/University of Pennsylvania, qualified as expert in statistical

Dr. Constance Clayton, Superintendent of Schools from October 1982 through August 1993, testified that all students can learn to the best of their potential as set forth in the School District's 1983 modified plan and that the Priority One initiative, plagued by teacher turnover in the schools, represented a part of the desegregation effort. Dr. Clayton indicated that the oldest school facilities in the District, some constructed more than 100 years ago and requiring the greatest amount of repair, are concentrated predominantly in minority areas containing racially isolated minority schools; that upon commencement of her tenure, she found schools not painted in over twenty-five years and generally poor maintenance conditions; and that security and school safety conditions are worse in the racially isolated minority schools. As superintendent, she began a facilities improvement program, established grade marking guidelines, made efforts to resolve the impact of teacher turnover in Priority One schools, expanded the pre-school education program, and initiated other measures in an effort to satisfy the educational goals of the School District. Under Dr. Clayton, approximately 21 million meals were served per year to students through the District's universal feeding program offered regardless of need.

According to Dr. Ernestine Carter, Director of the Office of Desegregation since 1979, the School District maintains thirty

analysis and relationship between race and various outcomes in testing, N.T. pp. 3429–3561, 6090–6186, 6252–6395; for Intervenor Lowell was Dr. Judith Goode, social and cultural anthropologist and Temple University Professor, qualified as expert in contrasting intergroup relations and how they affect particular schools, N.T. pp. 3566–3652; and witnesses for the School District were Dr. William Yancey, sociologist and Temple University Professor, qualified as expert in demographic characteristics of health in the City and in School District's specific problems, N.T. pp. 4266–4533; Dr. William W. Cooley, scientist and University of Pittsburgh Professor, qualified as expert in school district financing and relationship between such financing and state and other agencies, and taxing and how taxing authority relates to funding of districts in Pennsylvania, N.T. pp. 5534–5645; and Dr. Harold Hodgkinson, Director, Center for Demographic Policy, qualified as expert in factors affecting student achievement, relationship between poverty and test scores, demographics, and consultation to national school boards, cities and districts on remedies in place or offered in other cities, N.T. pp. 5652–5904.

magnet programs—three full magnet schools created prior to implementation of the 1983 modified plan (high school for engineering and science, high school for creative and performing arts and Bodine High School for international affairs); and the remainder are magnet programs within a school. Fifteen magnet programs are either desegregated or targeted for desegregation and fifteen are non-desegregated and are not targeted for desegregation. Dr. Carter testified that her office has maintained a 50/50 admissions policy for the magnet schools which are desegregated or targeted for desegregation, preferring to maintain 50 percent of the seats available in the magnet programs for White students. Recognizing that the School District's population was 22 percent White, Dr. Carter agreed that by maintaining the 50/50 admissions ratio, fewer seats were available for minority students.

No new magnet high schools have been created since 1983 and the increase in the number of students who could attend magnet high schools since that time has been approximately 1500. Dr. Carter concluded that the District had been unsuccessful in attracting White students to transfer out of their neighborhoods under the EH–36 transfer policy although Black and Hispanic students participated in this transfer policy to a much greater degree; however, the School District receives large numbers of White students who apply and are accepted into the EH–38 special admissions or magnet programs.

Using the School District's definition of a desegregated school, Dr. Carter stated that as of the 1992–93 school year, approximately twenty-five of the fifty schools targeted in 1983 were actually desegregated and admitted that beginning with the 1987–88 school year, the number of schools considered by the District to be desegregated had in fact declined. Dr. Carter stated that furthermore, the 1983 modified plan did not address school pairings, school closings, alteration of feeder patterns, or changing of grade structures as previously suggested by this Court or the Commission. The School District did however make use of linkages for schools which were overcrowded and her office identified space in schools where

desegregation opportunities existed for youngsters attending overcrowded schools. Efforts to resolve overcrowding have been limited to expansion of existing facilities such as portables and annexes and busing children from overcrowded schools to other locations.

The last school closings occurred approximately ten years ago prior to implementation of the 1983 modified plan; and since 1979, the School District has only opened Edison High School and a remedial disciplinary school in West Philadelphia which were not part of the desegregation program. As for new school construction, Dr. Carter's office has made no recommendations directly to the superintendent concerning additional new facilities which would increase desegregation opportunities. Moreover, the desegregation office has submitted no proposals to the School District to establish new magnet schools using School District operating or capital funds. Her office's budget for this year is approximately $15 million ($1 million from the state and $3.4 million from a federal grant) and $500,000 or little more than three per cent of her office's budget is devoted to the School District's efforts to reduce racial isolation among students in the racially isolated minority schools.

Dr. Harris testified that poor and minority urban schools can become effective schools (where achievement levels are high enough to demonstrate acceptable mastery of the curriculum), and that there are in fact poor racially isolated minority schools in Philadelphia where students are achieving. His philosophy is that if one school exists where Black and poor youngsters can learn, then other Black and poor schools can accomplish the same thing, citing the successes at Dick School where students increased their math scores from 1988 to 1991 by 19.8 percent. To improve the achievement levels, there must be a change in the "culture" of racially isolated minority schools where successful teachers are rewarded and nonsuccessful teachers penalized; and that staff must have higher expectations of these students if they are to achieve.

Further observations of Dr. Harris were that if a teacher believes that a child cannot learn in a segregated environment,

then the teaching staff becomes impotent to teach; if the School District believes that these children cannot learn because they come from single-parent homes, then the system is impotent to produce results; and if the School District believes that these children cannot learn because they are poor, then they are written off because the District defends its failures on the false assumptions that only additional funding can improve the quality of these children—an assumption also rejected by other experts in the field.[9] Dr. Harris' testimony concerning teacher expectations and school culture was repeatedly bolstered by witnesses for the School District and to that extent was found by the Court to be credible and persuasive. Moreover, Dr. Harris accurately depicted the School District's five-year goal to reduce academic achievement gaps by 10 percent as low-level expectations of minority students.

Dr. Madden analyzed whether after controlling for the effects of poverty, the fact that a school was racially isolated had an independent and separate effect on the outcome of achievement scores in reading and math. Dr. Yancey conducted his study to determine to what degree concentrations of minority populations of students in schools is important in affecting levels of achievement in racially isolated schools, using multiple regression equations with a series of variables—poverty, attendance rates, student turnover rates and busing. It was his conclusion that after controlling for the effects of poverty and school climate, the impact of race is substantially smaller than the effects of poverty and school climate.

Dr. Madden studied data on reading and math test scores of students in racially isolated minority schools and in the re-

9. In the dissenting opinion in *Dowell*, Justice Thurgood Marshall commented upon the school board's actions and its intransigence in developing a meaningful plan to remedy discrimination and remarked that "[b]ecause of the relative indifference of school boards toward all-Afro-American schools, many of these schools continue to suffer from high student-faculty ratios, lower quality teachers, inferior facilities and physical conditions, and lower quality course offerings and extracurricular programs." *Id.*, 498 U.S. at 260 n. 5, 111 S.Ct. at 643 n. 5 (references omitted).

mainder schools and found that although poverty was the most significant variable in explaining achievement differentials, racial isolation within the schools presented a statistically significant and independent variable affecting the achievement levels of students. It was her opinion that the standard way to determine whether racially isolated schools are different from remainder schools is by looking at the statistical significance of her findings, that is, after controlling for all other important influences, does racial isolation matter or "how stark is the result." Dr. Madden concluded that by all statistical standards, race does apply and the fact still remains that racially isolated schools are achieving at lower levels. Because of this fact, Dr. Madden opined that there is something in the environment of these schools which results in their lower achievement levels. Her studies revealed that the statistical significance was quite high for reading: the odds are 98 percent that reading scores will be lower in the School District's racially isolated schools than in the remainder schools and 99.97 percent probability that math scores will be lower.

Although Dr. Yancey did not testify about the statistical significance of racial differences, the studies conducted by both experts arrive at the same conclusion albeit with differing quantitative impact upon achievement in racially isolated schools. Both experts used as a measurement of achievement the proportion of students scoring above and below the national median on achievement tests and the same types of poverty figures, but Dr. Yancey used schools with over 70 percent Black and Hispanic enrollment rather than the School District's definition of a racially isolated school used by Dr. Madden. The Court however found Dr. Madden's testimony to be more persuasive as her studies included more current data, included test scores for both reading and math as opposed to restricting the study to reading as Dr. Yancey did, and did not include controls such as attendance or busing which admittedly the School District can effect. Dr. Yancey controlled for attendance in spite of his testimony that students attending racially isolated minority schools have the

highest percentage of attendance in the city. Moreover, while the experts disagreed on the significance or validity of the scatter plots used by Dr. Yancey to analyze his data, they agreed that teacher attitude may account for additional unexplained variances in performance and achievement between students.

Dr. Harold Hodgkinson testified that class income is most important as a predictor of achievement and studies show that early preschool education enhances a child's achievement potential in school. Reviewing the history of Head Start, he opined that any urban area which incorporates the Head Start program into the educational process will benefit significantly.[10] Dr. Hodgkinson expressed an opinion which the Court emphatically embraces: "prevention is a low-cost, effective strategy. Cure is very long term, very ineffective, and basically costs a very large amount of money." N.T., p. 5784. Thus by applying a general principle of educational institutes that the best resources should be placed in the earlier years to ensure success, the School District will receive the best return on its investment. Dr. Cooley similarly opined that if staff were deployed in the context of programs found to be successful in high poverty schools, there is a good chance of making a difference. The inference drawn from his work is that staff is not deployed to provide more professional staff in high poverty schools.

Teacher expectations also impact upon student achievement, and if new teaching strategies can be developed, Dr. Hodgkinson believes that a large number of the children in racially isolated minority schools can succeed. It is well established in

---

**10.** Dr. Hodgkinson recounted the results of a study conducted of Head Start children, now twenty-three years of age, which showed that those children at age twenty-one compared to the control group at the same age in terms of employment, high school graduation, college, and arrest records, have a greater percentage of· success in life. Because the average cost is $20,000 per year to ·maintain a prisoner, while the School District spent $5,783 per pupil for 1992–93 expected to decline to $5,317 for the current year, and studies show that 72 percent of America's prisoners are high school dropouts, Dr. Hodgkinson cautions that school districts must place the necessary resources at an early age to prevent future problems to students and society caused by a lack of education.

education that students are highly impressionable and respon-sive to the expectations and attitudes of their teachers and that anticipation by teachers of low-achievement levels for their students can become a self-fulfilling prophecy according to experts in the field. Studies have shown the correlation between teacher expectations and achievement and that speeding up the instruction to children from low-income back-grounds had spectacular success.[11]

School principals Roberta Kimmelman and Karen Scholnick testified that although 98 percent of more of their elementary school students are minority and poor, their schools have experienced significant improvements in achievement due to programs initiated by them which, in some instances, did not require additional financial resources. Rhoads School, the first to develop an educational improvement plan, was nomi-nated by the City as an exemplary school because of consis-tent increases in achievement since its participation in the school-wide project. Ms. Kimmelman testified that although discipline issues absorb a significant amount of her time and she is introducing conflict mediation as a tool to resolve disciplinary problems, she managed to change her school's climate in spite of the inability to pick the teachers she wanted or to remove non-performing teachers, or the School District's financial problems. She maintains a quality school because of initiatives which have changed the self-esteem of her students and teachers whose expectations of their students have been positively transformed. Ms. Scholnick reiterated that chang-ing teacher expectations as to poor and minority students is

11. Dr. Hodgkinson recalled a Milwaukee study of teacher expectations which demonstrated a definite correlation between expectations and student achievement. Teachers predicted that certain children in their classes would end up in jail, and because of those expectations teachers would make sure that this eventuality occurred by ignoring those students in class and not valuing their participation. Another example of the impact of teacher expectations was described by him and Dr. Yancey concerning an important study where teachers were given random and false test scores for their students. Certain of these students who reportedly tested high on intelligence turned out much improved performance because of the teachers' new image of the students and greater attention paid to them which reinforced classroom learning.

the most important step in increasing achievement levels in the racially isolated minority schools, creating a positive spiral effect. Moreover, staff development and professional training can assist teachers who have low expectations of poor children. This training however is voluntary and no formal system-wide training is in effect.

Amy Zowniriw testified for Intervenor Lowell that she is the corresponding secretary for the home and school association at Lowell Elementary School and Academy for the Middle Years (AMY Northwest), a board member of Parents Union for Better Schools, and a founding member of Olney–Oaklane–Feltonville Parents for Better Schools. She stated that the Olney–Feltonville neighborhood consists of Black, Hispanic, Asian and Whites students and that children are bused from that area to various schools in the northeast region because the neighborhood schools are overcrowded.[12] Eileen Bowles, a reading teacher at Lowell elementary school, testified that the normal capacity for the school is 706 students but that during the 1992–93 year there were 951 students at Lowell and that the student body was 36 percent Asian, 26 percent White, 21 percent Black, and 15 percent Spanish. She stated that Lowell buses approximately 350 students to other schools on between twelve to fifteen buses and that in addition to busing the students the School District has provided off-site and portable classrooms.

Dr. Judith Goode echoed the sentiments set forth in the 1983 modified plan supporting and encouraging neighborhood schools in integrated areas. From 1988 to 1990, Dr. Goode studied the effect of new immigration on intergroup relations

12. Lowell presented a letter dated December 6, 1991 from Ellen Linky, regional superintendent of the office of curriculum and instructional support, which indicates that the three most overcrowded schools in the Northeast Region are Morrison, Olney Elementary and Lowell; and that in 1991, Morrison bused to other schools between twelve and sixty children per bus on twenty five buses, Olney Elementary bused between six and twenty five children per bus on seven buses, and Lowell bused between six and twenty children per bus on four buses. In addition, as of June 1991, Lowell and Olney Elementary were considered stably desegregated schools, and Morrison was considered a multicultural school.

at the Morrison and Elkin elementary schools and examined the degree to which there were boundaries based on race, ethnicity or class within the schools. The Morrison school was 28 percent White, 22 percent Black, 30 percent Latino and 20 percent Asian; and the Elkin school was 55 percent White, 13 percent Black, 31 percent Latino, and 1 percent Asian. Dr. Goode concluded that the more residentially integrated the neighborhood, the more children are able to play in a "free, unfettered way" and the better relations are within the school. She also observed that the children were key to increasing intergroup relations among adults and were able to break down barriers between adult groups.

Irvin R. Davis, managing director of the school district, testified that as the administrator in charge of facilities, it is his responsibility to respond to requests for additional space; and admitted that although he has the capacity to fund and is looking into the need for additional schools based on enrollment, he has never discussed with Dr. Clayton or anyone else the idea of building additional classroom space or additional schools in residentially integrated neighborhoods which have overcrowded schools to further the desegregation effort. In addition, Dr. Clayton recalled discussions about the leasing, extending and purchase of facilities to deal with the issue of overcrowding but stated that the School District had not adopted a policy requiring any such facilities to be opened as desegregated schools.

(c)

In *Swann*, the court stated that equity jurisdiction confers upon a court the power to do equity and to fashion a decree deemed necessary under the facts of a particular case. Flexibility rather than rigidity has distinguished equity jurisdiction. Although numerous desegregation cases have been decided by the courts, the *Swann* court noted that there is no universal answer to the complex problem of desegregation. Each case must be examined in light of its present circumstances and available options. Moreover, in *Brown v. Bd. of Educ. of Topeka (Brown II)*, 978 F.2d 585 (1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 2994, 125 L.Ed.2d 688 (1993), the Court of

Appeals reversed the district court's decision to end judicial supervision over certain aspects of Topeka's desegregation plan, indicating that *Dowell* does not represent the Supreme Court's retreat from the principle that the measure of any desegregation plan is in its effectiveness.[13]

A case before the court in *United States v. City of Yonkers,* 833 F.Supp. 214 (S.D.N.Y.1993), raised many of the challenges presented here. The question confronted was whether vestiges of segregation remained in the Yonkers public school system which although capable of remedy were not being adequately addressed and as a consequence, the school system continued to discriminate against Black and Hispanic students. In finding that the principal factor found to be of paramount importance was the disparity in achievement levels between majority and minority students as measured by standardized test scores, the court concluded that where evidence demonstrates that children are not learning at acceptable levels, "all else pales in significance." *Id.* at 220.

The record in the case sub judice clearly demonstrates that the educational needs of students in racially isolated minority schools substantially exceed those of other students. The test scores, graduation and dropout rates in these schools are testimony both to the schools' failure and to their students' needs. Educators along with courts recognize that the education of the urban poor is an important problem, and conventional wisdom demonstrates that standard techniques are ineffective to address this problem. Educators and experts in the

13. In his dissent in *Dowell,* Justice Marshall stated his agreement with the majority that the proper standard for determining whether a school desegregation decree should be dissolved is whether purposes of the desegregation litigation have been fully achieved but expressed concern over the majority's failure to directly confront the possibility of a re-emergence of racially identifiable schools, stating that *Swann* establishes that if further desegregation is reasonable, feasible and workable, then it must be undertaken. The fact that litigation may have been protracted is no reason for a court's dissolution of a desegregation decree where a school district could have eliminated discrimination had the district taken available steps in early stages of the proceedings to promote desegregation and "shaping" (rather than following) public attitudes toward its schools. *See Id.,* 498 U.S. at 260–67, 111 S.Ct. at 643–47.

field, including Dr. Clayton, advocate an educational program which offers these children special assistance and individual attention; an intensive pre-school and all-day kindergarten enrichment programs to reverse the educational disadvantages these children start out with; intensive involvement of parents in the schools and in their children's education; incentives to teachers who offer to work in racially isolated minority schools; extended school year or required summer school enrollment; and most importantly, a greater alliance among local boards, administrators, teachers' organizations, local and state governmental bodies and the community at-large for the benefit of these children if they are to succeed.

The record firmly establishes that the School District is failing or refusing to provide an equal educational opportunity and a quality education to children attending racially isolated minority schools. An assessment of the School District's progress under the 1983 modified plan shows that some successes have been achieved, particularly when one evaluates the laudable progress of many Priority One schools and other initiatives by School District employees obviously committed and dedicated to the success of all children, but the overall implementation has been ineffective. This fact is made more evident when viewed in the context of testimony by School District professional staff and expert witnesses that all available measures or strategies have either not been considered or implemented by the School District which could enhance integration of its students and eliminate the racial disparities in achievements.

Some of those measures include, among many others, expansion of the magnet school program concept which the School District recognized in its 1983 modified plan was unusually effective in achieving desegregation; mandated system-wide teacher training and professional development particularly as to teaching strategies in low-achievement and poor schools; new school construction in naturally integrated neighborhoods to combat overcrowding while simultaneously preserving integrated schools; new school construction to equalize facilities and to offer additional desegregation opportuni-

ties; alteration of school feeder patterns or grade structures; maintaining and increasing the number of naturally integrated neighborhood schools; and replicating programs found to be successful at racially isolated schools such as Rhoads, Meade and Dick which created an eleven-month program to increase student achievement levels.

Other measures include solicitation of additional funding from local and state taxing authorities for desegregation purposes; increasing the level of EH–36 transfers from White students for desegregation purposes; development of strategies to improve student attendance rates; institution of system-wide disciplinary and conflict resolution policies to improve disciplinary problems within the schools; employment of retired and experienced school teachers to teach in racially isolated minority schools; reallocation of financial resources to equalize resources in those schools where need is the greatest; initiation of expanded preschool programs and full-day kindergartens; assignment of staff based upon the needs of the children and their schools; regular assessment of the desegregation office's accomplishments of the School District's goals and institution of accountability standards for that office; and most of all revisiting the School District's own expectations and goals for the success and academic achievements of students enrolled in the racially isolated minority schools.

Despite the multiplicity of feasible and workable strategies available to the School District to further desegregate the schools and to eliminate the racial disparities in student achievement, the District, among other things, permitted a disproportionate reduction in full-day kindergarten programs in the racially isolated minority schools where these programs were needed most; agreed in 1992 with the teachers' union to give up the School District's authority to assign teachers based on the needs of students and their schools and to prevent the negative impact of high teacher turnover; maintained racially imbalanced admissions policies for the magnet and other special admissions programs; allocated to personnel costs and fringe benefits essentially 100 percent of the Priority One budget for racially isolated schools rather than realloca-

tions for computer equipment, libraries, and other learning tools sorely needed in the low-achieving schools; eliminated all but one of the truant officer positions from the current budget while simultaneously defending the School District's failures in part on school dropout and truancy problems; and generally failing to heed the advice of its educators and professionals who advocate for expanded resources and efforts to improve the quality of education in racially isolated schools.

On the other hand, the Court is cognizant of the myriad social conditions which many urban school districts face and shall take notice of the escalating crime rates nationwide among youth; government's failure to eradicate the proliferation of drugs and illegal weapons within its cities; and most important, the lack of many parents to heed the advice of experts in the field concerning the desperate need for the involvement of parents in the education of their children. Nevertheless, the School District cannot escape its obligations to provide an equal educational opportunity to all of its children by placing the failures of parents or society on these childrens' shoulders. Unless something is done to correct the deficiencies, the impacts on their lives will deepen; and the impact upon the city, its economy and well-being is evident.

Equally important is that all children learn to live and function in a multicultural society, and this training can be achieved only through exposure in an integrated environment. Concerned with the detrimental effects of maintaining a segregated school system, the court in *Chester School Dist.* quoted a wise educator within the school system:

Students are a product of the learning experience which are provided for them, their experience of interacting with people of various backgrounds socially, economically and culturally. Just as you don't learn to swim by just looking at a swimming pool and without ever getting into it, you don't learn to understand people unless you associate with them. Learning is not confined to just the direction which is given to four walls of a classroom. Children learn through their association with each other in the cafeteria, eating lunch together. They learn through going on class

trips together, journeys and educational excursions. They learn in the way in which they appreciate programs. They learn in the way in which they work together on committees in preparing class projects. And there is no way that a teacher, no matter how excellent she is, there is no way that he or she can give a child this experience.

*Id.* 427 Pa. at 176, 233 A.2d at 300.

The School District established the policy that desegregation is a goal and integration is the objective. It now advocates the contrary view and argues that race-conscious student assignments should be prohibited which will undoubtedly reverse the voluntary desegregation gains made to date, albeit insufficient. Children of all races must and should learn to exist in a multicultural society and to respect their cultural differences. Perhaps through an integrated educational environment, future generations will no longer be plagued by racial intolerance and indifference and the consequent loss of spirit and resources, but will instead enjoy a society where people no longer judge one another by the color of their skin or ethnic background.

### (d)

The 1983 modified plan concludes with a statement by Dr. Clayton:

[I]t is imperative that we turn our attention from litigating to educating—that we are allowed to devote our energy and resources and talent to the urgent tasks that now confront all urban school systems.... What parents with children in public schools want most for their children is quality education in a safe school environment. That is also what they have a right to expect. In the final analysis, charts and edicts cannot ordain desegregation. ... Desegregation is not buses but people. Its success is determined in the keener insight of a learner, the deeper sensitivity of a teacher, the wider vision of a community. All else is facade.

*Id.* at 63, 69–70. The School District must and shall provide the quality education which all children within its schools have a right to expect.

■ The Court concludes that the School District has failed to desegregate the public schools by all feasible means and continues to maintain a racially segregated school environment where all of the students do not receive equal educational opportunities or a quality education mandated by the laws of this Commonwealth. In 1954, the highest court in this nation ruled that where the state undertakes to provide the opportunity for an education, it is a right which must be made available to all students, Black and White, on equal terms. To the detriment of Black and Hispanic students, this right has not been made available on equal terms to all of the students in Philadelphia's public schools.

The record amply demonstrates that the School District has not provided to Black and Hispanic students equal access to, among other things, the best qualified and most experienced teachers, equal physical facilities and plants, equal access to advanced or special admissions academic course offerings, equal allocation of resources, or a commitment to eliminating racial imbalances in the schools to the extent feasible. Consequently, the Commission's petition to enforce the law is granted. Counsel will be required to appear before the Court to review the process for the appointment by the Court forthwith of a master or team of educational experts to develop a desegregation plan which, after consideration of public viewpoints, effectively complies with the law.

The plan shall incorporate specific and reasonable academic achievement goals for students in racially isolated minority schools, programs or strategies designed to meet the achievement goals, expansion and/or institution of pre-school and full-day kindergarten programs, recommendations for expansion of the school day and/or school year, recommendations for incentives to attract a greater percentage of experienced and better qualified teachers to work in the racially isolated minority schools, expansion of magnet and special admissions programs, expansion of the voluntary movement of students for desegregation purposes, recommendations for resolving overcrowded conditions and increasing the number of schools in integrated neighborhoods, steps to combat school security and

safety problems, new strategies to encourage non-participating parents to become involved in the education of their children, and cost projections. The plan shall incorporate all other feasible and workable goals and strategies aimed at remedying the racial disparities in educational opportunities and student achievement and further enhancing voluntary desegregation of the Philadelphia public schools. The plan shall also contain timetables for implementation.

## ORDER

AND NOW this 4th day of February, 1994, having granted the Pennsylvania Human Relations Commission's petition for enforcement of its final order and the April 15, 1983 order of this Court, Counsel are hereby directed to appear for conference in this case on Thursday, February 17, 1994 at 10:00 a.m., Commonwealth Court Courtroom One, Widener Building, Philadelphia, to discuss the process for development of a desegregation plan and timetable for implementation consistent with the foregoing opinion.